[No. C055104. Third Dist. Mar. 26, 2008.]

STATE WATER RESOURCES CONTROL BOARD CASES.

## COUNSEL

Law Offices of Stephan C. Volker, Stephan C. Volker, Joshua A. H. Harris and Marnie E. Riddle for Plaintiffs and Appellants Golden Gate Audubon Society, Marin Audubon Society, San Joaquin Audubon Society, California Sportfishing Protection Alliance and Committee to Save the Mokelumne.

Edmund G. Brown, Jr., Attorney General, Mary E. Hackenbracht, Assistant Attorney General, Mark W. Poole and Clifford T. Lee, Deputy Attorneys General, for Defendant and Respondent State Water Resources Control Board.

## OPINION

**ROBIE, J.**—In an earlier opinion in these coordinated cases—*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674 [39 Cal.Rptr.3d 189] (*SWRCB Cases*)—this court decided "eight appeals and three cross-appeals in seven coordinated cases" that "arose out of an omnibus water rights proceeding before the State Water Resources Control Board (the Board)" involving the San Francisco Bay/Sacramento-San Joaquin Delta Estuary. (*Id.* at p. 687.) One of the seven coordinated cases was *Golden Gate Audubon Society v. State Water Resources Control Bd.* (Super. Ct. Alameda County, 2003, No. 825585-9), a mandamus proceeding brought by five

nonprofit organizations (collectively the Audubon Society parties).[1] (*SWRCB Cases*, at pp. 718, 773.) Another one of the coordinated cases was *Central Delta Water Agency v. State Water Resources Control Bd.* (Super. Ct. S.F. City and County, 2003, No. 311502), a mandamus proceeding brought by six parties with interests in the Central Sacramento-San Joaquin Delta (collectively the Central Delta parties).[2] (*SWRCB Cases*, at pp. 718, 724.)

Ultimately, this court determined the Audubon Society parties and the Central Delta parties were entitled to essentially the same mandamus relief against the State Water Resources Control Board (the Board).[3] (*SWRCB Cases*, *supra*, 136 Cal.App.4th at p. 844.) On remand, after the trial court entered judgment in favor of the Audubon Society parties in compliance with this court's directive, they sought attorney fees under the private attorney general doctrine embodied in Code of Civil Procedure section 1021.5 (section 1021.5). The trial court denied their motion, concluding they had not shown that the necessity of private enforcement made a fee award appropriate. The trial court based this conclusion on the fact that the relief the Audubon Society parties obtained directed the Board to do nothing more than provide the relief the Central Delta parties had already obtained.

For reasons we will explain, we conclude the trial court erred in denying the Audubon Society parties' motion for attorney fees under section 1021.5. That the success they achieved was the same success the Central Delta parties achieved does not justify a denial of a fee award under the private attorney general theory, especially since the trial court *granted* the motion by two of the Central Delta parties for fees under section 1021.5. Where two parties achieve the same relief acting essentially as private attorneys general, even though one of the parties is a public entity, there is no rational basis to conclude that the public entity is entitled to be rewarded for its success under section 1021.5, but the private party is not. Accordingly, we will reverse the order denying the Audubon Society parties' fee motion and remand the matter for a determination of the amount of fees to which they are entitled.

---

[1] The individual organizations are Golden Gate Audubon Society, Marin Audubon Society, San Joaquin Audubon Society, California Sportfishing Protection Alliance, and Committee to Save the Mokelumne. (*SWRCB Cases*, *supra*, 136 Cal.App.4th at p. 773, fn. 47.)

[2] Those parties are Central Delta Water Agency, R.C. Farms, Inc., Reclamation District No. 2072, Reclamation District No. 2039, Zuckerman-Mandeville, Inc., and South Delta Water Agency. (*SWRCB Cases*, *supra*, 136 Cal.App.4th at p. 724, fn. 19.)

[3] The writ of mandate to which this court determined the Central Delta parties were entitled was slightly broader than the writ to which the Audubon Society parties were entitled, but that difference has no bearing on the present appeal. As will be shown, what matters is that to a large extent both groups of parties were determined to be entitled to the same relief.

FACTUAL AND PROCEDURAL BACKGROUND

I

*The 1995 Bay-Delta Plan and Decision 1641*

Fortunately, the entire background of these coordinated cases—which took up 30 pages in this court's earlier opinion—need not be repeated here. Suffice it to say that in May 1995, the Board adopted a new water quality control plan for the Bay-Delta (the 1995 Bay-Delta Plan) that, among other things, "set minimum monthly average flow rates on the San Joaquin River at Vernalis (the Vernalis flow objectives)." (*SWRCB Cases, supra,* 136 Cal.App.4th at pp. 701–702.) The 1995 Bay-Delta Plan also "included a narrative objective for the protection of salmon, which provided: 'Water quality conditions shall be maintained, together with [other] measures in the watershed, sufficient to achieve a doubling of natural production of chinook salmon from the average production of 1967–1991, consistent with the provisions of State and federal law.' " (*Id.* at p. 703.) The narrative salmon protection objective and the Vernalis flow objectives were established (along with various other objectives) to protect fish and wildlife uses served by the waters of the Delta. (*Id.* at p. 701.)

In its program of implementation, the 1995 Bay-Delta Plan provided that the various flow objectives for the protection of fish and wildlife, including the Vernalis flow objectives, would be implemented through a water rights proceeding in which the Board would allocate responsibility for meeting those objectives among water rights holders in the Bay-Delta Estuary watershed. (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 703.) With respect to the narrative salmon protection objective, the plan provided that " 'in addition to the timely completion of a water rights proceeding to implement river flow and operational requirements which will help protect salmon migration through the Bay-Delta Estuary, other measures may be necessary to achieve the objective of doubling the natural production of chinook salmon from average 1967–1991 levels.' " (*Id.* at pp. 704–705.)

In 1997, the Board commenced the water rights proceeding to "allocate responsibility for implementing the flow-dependent objectives of the 1995 Bay-Delta Plan." (*SWRCB Cases, supra,* 136 Cal.App.4th at pp. 705–706.) Ultimately, as part of that proceeding, instead of allocating responsibility for meeting all of the Vernalis flow objectives to water rights holders in the watershed, the Board approved an arrangement under which, for a period of

time, all of Vernalis flow objectives would be met except for one—the Vernalis pulse flow objective.[4] (*Id.* at pp. 706–710.)

## II

### *The Underlying Litigation*

In April 2000, the Central Delta parties filed their writ petition seeking to vacate the Board's decision in the water rights proceeding (revised water right decision (Decision 1641)).[5] (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 724.) Included in that petition was a cause of action that "alleged, among other things, that in adopting Decision 1641, the Board 'failed to implement the 1995 Water Quality Control Plan,' including . . . the 'Vernalis Fish Flow objectives.' " (*Ibid.*)

That same month (Apr. 2000) the Audubon Society parties filed their own writ petition seeking to set aside Decision 1641. (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 773.) "In the first cause of action in their petition, the Audubon Society parties alleged Decision 1641 was 'contrary to law and is not supported by substantial evidence because it' 'purport[s] to authorize water rights inconsistent with applicable water quality objectives of the 1995 Bay-Delta Plan.' The Audubon Society parties further alleged that Decision 1641 'ignored' the salmon-doubling objective." (*Ibid.*)

In adjudicating the Central Delta parties' petition, "the trial court concluded that the Vernalis flow objectives were 'the legal minimum flow objectives that must be satisfied unless changed in an appropriate proceeding to modify the 1995 Plan itself.' " (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 724.) Accordingly, the trial court entered judgment in favor of the Central Delta parties directing issuance of a writ of mandate to the Board requiring compliance with the Vernalis flow objectives. (*Id.* at p. 725.) The court denied the petition on all other grounds. (*Ibid.*)

In adjudicating the Audubon Society parties' petition, the trial court concluded (as relevant here) that Decision 1641 " 'supports and advances the narrative goal of doubling salmon survival.' " (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 773.) "Based on its rejection of this and other arguments by the Audubon Society parties . . . , the trial court entered judgment . . ." against them. (*Ibid.*)

---

[4] The Vernalis pulse flow objective required "a 'pulse' flow during a 31-day period in April and May of each year." (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 702.)

[5] The Central Delta parties actually filed two writ petitions; the second one, which was limited to issues involving the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) (*SWRCB Cases, supra,* 136 Cal.App.4th at p. 724, fn. 20), is not relevant here.

III

*The Prior Appeals*

Numerous parties, including the Board, appealed from the judgment in favor of the Central Delta parties. (*SWRCB Cases*, *supra*, 136 Cal.App.4th at p. 725.) Those parties argued that "the 1995 Bay-Delta Plan allowed for staged implementation of the Vernalis pulse flow objective, and the Board's decision to adopt . . . alternate flows during an interim, experimental stage was both authorized and reasonable." (*Id.* at p. 726.) This court disagreed, concluding there was nothing in the plan "that authorized [the Board] to implement a flow objective *other* than the Vernalis pulse flow objective, even temporarily." (*Id.* at p. 727.) This court agreed with the trial court that "by adopting [an alternate] flow regime in lieu of the Vernalis pulse flow objective in Decision 1641, even on a temporary basis, the Board failed to fully implement the 1995 Bay-Delta Plan and instead accomplished a de facto amendment of that plan without complying with the procedural requirements for amending a water quality control plan." (*Id.* at pp. 733–734.) Accordingly, this court affirmed the judgment in favor of the Central Delta parties to the extent it directed the issuance of a writ of mandate requiring the Board to commence further appropriate proceedings to either assign responsibility for meeting the Vernalis pulse flow objective or modify that objective.[6] (136 Cal.App.4th at pp. 734, 844.)

On appeal from the judgment against them, the Audubon Society parties renewed their argument that the Board had failed to address and implement the narrative salmon protection objective. (*SWRCB Cases*, *supra*, 136 Cal.App.4th at pp. 772–774.) "To the extent the Audubon Society parties contend[ed] the Board abused its discretion because it failed to do more in this water rights proceeding to achieve the salmon protection objective than implement the Vernalis flow objectives, [this court] agree[d] with the trial court that the Audubon Society parties failed to establish an abuse of discretion by the Board." (*Id.* at p. 775.) This court concluded that "the Board had no obligation in this water rights proceeding to determine whether *other* flow objectives should be imposed to achieve the salmon objective. Instead, its obligation was to actually implement the specific flow objectives it had committed itself to implementing." (*Id.* at p. 776.) On that point, however, this court reiterated that "the Board did not actually carry through on that commitment" because—"as [the court] previously concluded in connection

---

[6] This court also modified the judgment in favor of the Central Delta parties with respect to some other objectives (the southern Delta salinity objectives). (*SWRCB Cases*, *supra*, 136 Cal.App.4th at pp. 734–735, 844.) That aspect of the Central Delta parties' victory is not relevant here.

with the challenges of the Central Delta parties"—the Board did not implement the Vernalis pulse flow objective. (*Id.* at p. 777.) This court "agree[d] with the Audubon Society parties that by failing to implement all of the Vernalis flow objectives . . . , the Board 'fail[ed] to establish the minimum flows necessary to achieve the salmon-doubling standard.' " (*Ibid.*) Thus, this court concluded "the Audubon Society parties were entitled to a writ of mandate on this narrow ground, even though the trial court, in response to the non-CEQA writ petition by the Central Delta parties, ordered a writ to issue that would have the same practical effect." (*Ibid.*) Based on this conclusion, this court directed the trial court to enter a judgment in favor of the Audubon Society parties that was the same as the judgment in favor of the Central Delta parties (with the exception of the language relating to the southern Delta salinity objectives)—i.e., a judgment ordering "the issuance of a writ of mandate commanding the Board to commence further appropriate proceedings to either assign responsibility for meeting the Vernalis pulse flow objective or to modify [that] objective." (*Id.* at p. 844.)

## IV

### *The Attorney Fees Motions*

On remand, two of the Central Delta parties—Central Delta Water Agency (Central Delta) and South Delta Water Agency (South Delta), both of which are public entities—filed a motion for attorney fees under section 1021.5.[7] Following entry of the judgment in their favor, the Audubon Society parties filed a similar motion. It does not appear from the record before us what position the Board took on the fee request by Central Delta and South Delta (except that they argued the motion was untimely). The Board, however, opposed the fee request by the Audubon Society parties, arguing that they had "prevailed at the Court of Appeal solely due to the successful efforts of the [Central Delta parties]" and therefore were not prevailing parties and could not show the necessity of private enforcement (two of the elements for a fee award under section 1021.5).

The trial court granted the fee request by Central Delta and South Delta, although limiting their recovery to 40 percent of the fees they claimed due to their "partial and limited success upon the overall objectives of their action." The court denied the fee request by the Audubon Society parties, agreeing with the Board that they had not "satisfied the last criteri[on] as to the necessity of . . . private enforcement."

---

[7] These two agencies apparently bore all of the litigation expenses incurred by the six Central Delta parties.

The Audubon Society parties subsequently filed a timely notice of appeal. No appeal was taken from the award of fees to Central Delta and South Delta.

## DISCUSSION

### I

#### *Section 1021.5*

Section 1021.5 provides that "[u]pon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

On review, "An appellate court may reverse a trial court decision denying attorney fees under section 1021.5 for a prejudicial abuse of discretion." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297 [255 Cal.Rptr. 704].) "The pertinent question is whether the grounds given by the court for its denial of an award are consistent with the substantive law of section 1021.5 and, if so, whether their application to the facts of this case is within the range of discretion conferred upon the trial courts under section 1021.5, read in light of the purposes and policy of the statute." (*Drew*, at p. 1298.)

Here, the primary issue on appeal is whether the trial court abused its discretion in determining that the Audubon Society parties failed to satisfy the necessity criterion of the statute. Thus, we begin with the question of whether the trial court's determination on the necessity criterion was consistent with the substantive law of section 1021.5. We conclude it was not.

### II

#### *The Necessity Criterion*

### A

#### *Its Historical Development*

■ As noted above, one of the criteria for an award of attorney fees under section 1021.5 is that "the necessity . . . of private enforcement, or of

enforcement by one public entity against another public entity, [is] such as to make the award appropriate . . . ." To understand how the necessity criterion operates here, we need to trace the development of that criterion and the way it has been applied in various situations.

In its original form, section 1021.5 did not allow for an attorney fee award to a public entity. (See Stats. 1977, ch. 1197, § 1, p. 3979; *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 254–256 [227 Cal.Rptr. 899].) Thus, in applying the necessity criterion under the original version of the statute, the sole question was whether the necessity of *private* enforcement made a fee award appropriate. As this court explained, "Section 1021.5 [wa]s intended as a 'bounty' for pursuing public interest litigation . . . ." (*California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 570 [35 Cal.Rptr.2d 396].) "[T]he statutory requirement of 'necessity . . . of private enforcement' addresses the issue of the comparative availability of *public* enforcement . . . ," i.e., it " 'looks to the adequacy of *public* enforcement and seeks economic equalization of representation in cases where private enforcement is necessary. Where suit is brought against governmental agencies and officials, the necessity of private enforcement is obvious. In such situations private citizens alone must "guard the guardians" and the disparity in legal resources is likely to be greatest.' " (*City of Sacramento v. Drew, supra,* 207 Cal.App.3d at pp. 1298–1299.) If, on the other hand, "there is a public attorney general available to enforce the important right at issue there is no utility in inducing a private attorney general to duplicate the function." (*Id.* at p. 1299.)

In *Committee to Defend Reproductive Rights v. A Free Pregnancy Center* (1991) 229 Cal.App.3d 633 [280 Cal.Rptr. 329], the appellate court addressed how the necessity criterion operated in a case where a private party engaged in public interest litigation alongside a public entity. In *Committee to Defend Reproductive Rights,* two private parties filed a complaint for false advertising and unfair business practices against various defendants on the ground they were falsely representing that a reproductive counseling facility was a medical facility which provided abortion counseling and referral. (*Id.* at pp. 635–636.) Four months after the filing of that complaint, the San Francisco District Attorney filed a similar action against most of the same defendants. (*Id.* at p. 636.) The two cases were consolidated and tried together. (*Ibid.*) The trial court issued an injunction restraining the defendants "from operating the center in such a way as to suggest abortion services were available." (*Ibid.*) Part of the injunctive relief was based on the complaint of the private plaintiffs' alone, and they were also responsible for obtaining relief against parties the district attorney had not named. (*Ibid.*) Nevertheless, the trial court denied the private plaintiffs an award of fees under section 1021.5 on the ground that, in light of

the district attorney's parallel action, "their suit was not necessary as that term is defined in section 1021.5." (*Committee to Defend Reproductive Rights,* at pp. 636–637, 640.)

■ On appeal, one of the issues was whether the private plaintiffs' action should be "considered unnecessary within the meaning of section 1021.5 merely because, subsequent to filing their suit, the People, through the district attorney, filed a similar action." (*Committee to Defend Reproductive Rights v. A Free Pregnancy Center, supra,* 229 Cal.App.3d at p. 640.) The appellate court answered that question in the negative, noting that although it found "no California authority directly on point, federal cases have held that private parties who cooperate with governmental officials in litigation are not barred, by reason of the latter's participation therein, from recovering attorney fees" under the private attorney general theory. (*Id.* at p. 641.) In such a case, the court concluded, "an attorney fee award is dependent upon an ultimate finding of the trial court that the colitigating private party rendered necessary and significant services of value to the public or to a large class of persons benefited by the result of the litigation." (*Id.* at p. 642.) Thus, the rule derived from *Committee to Defend Reproductive Rights* is this: If a public entity and a private party prosecute important public interest litigation together—whether in the same action, consolidated actions, or (as here) coordinated actions—and obtain the same success, the right of the private party to an award of attorney fees under section 1021.5 depends on whether the private party rendered services that were necessary and significant to achieving that success.

In 1993, the Legislature amended section 1021.5 "to its present form, which allows a public entity to recover attorney fees from another public entity." (*People ex rel. Brown v. Tehama County Bd. of Supervisors* (2007) 149 Cal.App.4th 422, 450 [56 Cal.Rptr.3d 558].) By this amendment, the Legislature essentially recognized that sometimes there may be a need for one public entity to engage in public interest litigation against another public entity under circumstances that make a fee award under section 1021.5 appropriate. Indeed, the legislative history of the 1993 amendment to the statute reveals that the amendment was aimed (at least in part) at "enabl[ing] small public entities to resist large, well-financed public entities, who, in the absence of [the amendment], [would] simply bludgeon the former into legal submission." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 764 (1993–1994 Reg. Sess.) as amended July 16, 1993, p. 4.) Thus, in the wake of the 1993 amendment, there may be circumstances in which it is proper to pay a "bounty" under section 1021.5 to encourage public entities to pursue public interest litigation against other public entities.

In *City of Santa Monica v. Stewart* (2005) 126 Cal.App.4th 43 [24 Cal.Rptr.3d 72], the appellate court addressed how the necessity criterion

operates in a case where two or more private parties engage in public interest litigation alongside each other. The aspect of *Stewart* relevant here involved an initiative passed in the City of Pasadena that amended the city charter. (*Id.* at p. 54.) When the city refused to perform certain ministerial duties required before the charter amendment could take effect, a city resident (Amy) sought mandamus relief. (*Ibid.*) Two other parties, including the nonprofit organization that sponsored the initiative (FTCR (Foundation for Taxpayer & Consumer Rights)), later intervened in the action on Amy's behalf. (*Id.* at pp. 50, 54.)

After the court granted Amy's mandamus petition on the ground the city was required to perform the ministerial duties, FTCR sought an award of attorney fees under section 1021.5. (*City of Santa Monica v. Stewart, supra,* 126 Cal.App.4th at pp. 55, 57.) The trial court denied the motion in part on the ground that "FTCR had not contributed significantly to the action because . . . the court 'probably would have granted' the writ petition based on Amy's arguments alone . . . ." (*Id.* at p. 57.)

On appeal, the appellate court concluded that the trial court had "misinterpreted and misapplied" the necessity criterion of section 1021.5. (*City of Santa Monica v. Stewart, supra,* 126 Cal.App.4th at pp. 84–85.) The city argued that "in determining whether an attorneys' fees award is warranted or by whom, the 'necessity' portion of the test not only looks to the availability of public enforcement, but weighs the relative contributions of each private guardian." (*Id.* at p. 85.) The court disagreed, concluding that "the policies underlying the intervention and private attorney general statutes" do not "support a trial court's ability to weigh the contributions of multiple private attorneys general in determining whether each is entitled to attorneys' fees." (*Id.* at p. 87.) The court observed that a party who intervenes in an action is entitled to all of the same remedies as the original parties. (*Ibid.*) The court also observed that "the policy underlying section 1021.5 encourages a party without substantial resources to prosecute actions to vindicate important public constitutional and statutory rights, knowing that if it prevails it will receive financial compensation for its substantial efforts in that endeavor." (*Ibid.*) The court concluded that these policies would be undermined by a rule that "conditions an intervenor's entitlement to private attorney general fees on an after-the-fact assessment of whether the intervenor's participation was 'necessary' to the successful result achieved." (*Id.* at p. 88.) Thus, the rule derived from *Stewart* is this: If two private parties prosecute important public interest litigation together and obtain the same success, neither party's services can be deemed unnecessary simply because the other party would have succeeded without them.

## B

### *Its Application Here*

With this understanding of the necessity criterion and its application in mind, we turn to the arguments in this case. As it did in the trial court, the Board relies heavily on *Committee to Defend Reproductive Rights* to argue that the Audubon Society parties did not satisfy the necessity criterion here. In the Board's view, because two of the Central Delta parties—Central Delta and South Delta—are "public agencies authorized by statute," *Committee to Defend Reproductive Rights* applies, and the pertinent question in determining whether "the necessity . . . of private enforcement" was "such as to make [a fee] award appropriate" to the Audubon Society parties was whether the Audubon Society parties provided necessary and significant services above and beyond those provided by the Central Delta parties. The Board contends they did not, because "the Audubon Society parties' contribution on the issue of the Vernalis fishery flow objectives was duplicative of the Central Delta parties and unnecessary." The Board contends that "[s]ince a public entity was available to enforce this issue, and, in fact, ably did so, 'there is no utility in inducing a private attorney general to duplicate the function.' "

What the Board's argument overlooks, however, is that Central Delta and South Delta received an award of attorney fees under section 1021.5 for their efforts in these coordinated cases. Thus, unlike the district attorney in *Committee to Defend Reproductive Rights*, they were paid a "bounty" for pursuing litigation to challenge the Board's failure to fully implement the 1995 Bay-Delta Plan, like any other private attorney general might have been. This distinction raises the question of whether, for purposes of assessing the necessity criterion with respect to the Audubon Society parties, the rule in *Committee to Defend Reproductive Rights* should apply because Central Delta and South Delta are public entities, or the rule in *Stewart* should apply and Central Delta and South Delta should be treated as private parties because they were compensated for their efforts like a private attorney general would have been. We believe the answer to that question lies in the purpose of section 1021.5.

■ In the wake of the 1993 amendment, the purpose of section 1021.5 is to encourage parties—whether public or private—who do not necessarily have adequate financial resources to do so to pursue important public interest litigation for the benefit of the public at large, or at least for the benefit of more than just themselves or their constituents. Of course, "there are within the executive branch of the government offices and institutions (exemplified by the Attorney General) whose function it is to represent the general public in such matters and to ensure proper enforcement." (*Serrano v. Priest* (1977) 20 Cal.3d 25, 44 [141 Cal.Rptr. 315, 569 P.2d 1303].) When such public

entities perform their function—like the district attorney in *Committee to Defend Reproductive Rights*—then "there is no utility in inducing a private attorney general to duplicate the function" (*City of Sacramento v. Drew, supra*, 207 Cal.App.3d at p. 1299), and the efforts of the colitigating private party should be evaluated under the rule in *Committee to Defend Reproductive Rights*, looking to see whether the private party rendered services that were necessary and significant to the success that was achieved. If, on the other hand, there is no public attorney general available to act, then the "bounty" that section 1021.5 provides must be available to any party, public or private, who takes on the responsibility of pursuing important public interest litigation beyond its own interests. And if more than one such party takes on that responsibility, then each such party is eligible for fees under section 1021.5 under the reasoning of *Stewart*, and no single party can be given preference for purposes of determining whether the necessity criterion of the statute has been met.

Here, there was no public attorney general available to pursue litigation against the Board to force it to fully implement the 1995 Bay-Delta Plan because the Attorney General represented the Board. Thus, it fell to other public and private parties—such as the Central Delta parties and the Audubon Society parties—to pursue such litigation, with the prospect of obtaining fees under section 1021.5 in the event they succeeded. Under these circumstances, the services of the Central Delta parties could not be deemed unnecessary because the success they achieved was largely mirrored by the success achieved by the Audubon Society parties, and likewise the services of the Audubon Society parties could not be deemed unnecessary because the success they achieved was mirrored by that of the Central Delta parties.

To require the Audubon Society parties to make the showing demanded in *Committee to Defend Reproductive Rights*, as the Board would have it, would effectively elevate the Central Delta parties to the role of a public attorney general, whose job it is to litigate the important public issues at stake, while relegating the Audubon Society parties to the subordinate role of private attorneys general, who must show that their services, which supplemented those of the public attorney general, were necessary and valuable to the ultimate outcome of the case. There is simply no rational basis for doing so, however, when the Central Delta parties were rewarded for their efforts under section 1021.5 and therefore clearly were *not* acting like a true public attorney general, who is not entitled to fees under section 1021.5 because it is "his or her job" "to pursue litigation that is in the general interest of the state's population." (*People ex rel. Brown v. Tehama County Bd. of Supervisors, supra*, 149 Cal.App.4th at p. 454.)

Nor does it matter that the Audubon Society parties achieved their success after the Central Delta parties had already obtained relief from the trial court.

As we have noted, numerous parties, including the Board, appealed from the judgment in favor of the Central Delta parties. While it is true the Central Delta parties ultimately managed to successfully defend their judgment on appeal, the efforts of the Audubon Society parties cannot be deemed unnecessary and duplicative in hindsight based on that success. When they appealed the judgment against them, the Audubon Society parties did not know whether the Central Delta parties would be able to successfully defend the judgment in their favor. And even if it could be said that the Audubon Society parties should have known the Central Delta parties' efforts alone probably would be sufficient to ensure that the Board was ordered to fully implement or modify the Vernalis pulse flow objective, "indulging such a probabilistic view of causality" (*City of Sacramento v. Drew, supra*, 207 Cal.App.3d at p. 1302) in applying the necessity criterion of section 1021.5 would undermine the very purpose of the statute, which is "to induce persons to shoulder a burden disproportionate to their personal financial stake in order to ensure the vindication of important public rights" (*City of Sacramento v. Drew, supra*, 207 Cal.App.3d at p. 1301).

Here, both the Audubon Society parties and the Central Delta parties sought to ensure full enforcement of the 1995 Bay-Delta Plan, which no one denies was of great importance to the public. In large part, both achieved the same measure of success. To deny a fee award to the Audubon Society parties under these circumstances based on an assessment of the likelihood that the Central Delta parties would successfully defend the judgment in their favor on appeal would discourage future private attorneys general from seeking to join the fray in important public interest litigation and thereby defeat the purpose of the statute. We cannot countenance such a result.

■ In summary, we conclude that where (as here) a public entity receives fees under section 1021.5 for succeeding in important public interest litigation, a private party who succeeded alongside that public entity cannot be denied a similar award of fees simply because the success might have been achieved by the public entity acting alone. Because the trial court's ruling contravened this principle, the court abused its discretion in denying the Audubon Society parties' fee motion under section 1021.5.

### III

### *The Successful Party Criterion*

The foregoing conclusion also provides the basis for rejecting another argument advanced by the Board in an effort to justify the trial court's ruling. The Board argues that notwithstanding the necessity criterion, the Audubon Society parties do not qualify as successful parties "because they cannot

demonstrate any causal connection between their involvement in this coordinated proceeding and the result obtained." In the Board's view, because the Audubon Society parties achieved no more than the Central Delta parties, their efforts did not result in the enforcement of an important right affecting the public interest.

We view this as simply a repackaged version of the Board's argument on the necessity requirement, which we have rejected already. Without a doubt, the Audubon Society parties were successful because they obtained a judgment requiring the Board to fully implement the Vernalis flow objectives, which the Board had failed to do. The fact that the Central Delta parties also achieved this same success does not transform the Audubon Society parties' success into a defeat. To conclude otherwise would be to entitle the efforts of the Central Delta parties to some preferential consideration for purposes of section 1021.5, something we have already determined is not justified.

## IV

### The Significant Public Benefit Criterion

In a last ditch effort to salvage the trial court's ruling, the Board argues that the Audubon Society parties "conferred no benefit on the general public, let alone a significant one," because "the benefit conferred here"—the enforcement of the Vernalis flow objectives—"was conferred by the Central Delta parties." The Board is wrong. Both groups—the Central Delta parties *and* the Audubon Society parties—succeeded in conferring the same benefit on the general public by obtaining judgments that required the Board to fully implement the Vernalis flow objectives. Again, there is no rational basis for preferring the success of the Central Delta parties to that of the Audubon Society parties, where neither group was acting as a true public attorney general, but instead were both acting essentially as private attorneys general with the prospect of obtaining a "bounty" for their services under section 1021.5.[8]

---

[8] Normally, a trial court is not foreclosed from considering "the relative contributions of multiple private attorneys general when it exercises its discretion to determine the proper amount of an attorneys' fees award." (*City of Santa Monica v. Stewart, supra*, 126 Cal.App.4th at p. 88.) In a situation like this, however, which involved coordinated cases rather than a single case (as in *Stewart*), and thus multiple judgments, the trial court must fairly weigh the extent to which the services of the Audubon Society parties contributed to the success achieved in *their* action, not just the success achieved in the coordinated actions as a whole. Moreover, as a guiding principle, the trial court must keep in mind that the success the Audubon Society parties achieved is not to be discounted simply because the Central Delta parties achieved a similar success.

## DISPOSITION

The order denying the Audubon Society parties' motion for attorney fees is reversed, and the matter is remanded to the trial court to determine the amount of fees to which the Audubon Society parties are entitled. The Audubon Society parties shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a).)

Blease, Acting P. J., and Hull, J., concurred.