[No. C064907. Third Dist. Jan. 24, 2013.]

CALIFORNIA REDEVELOPMENT ASSOCIATION et al., Plaintiffs and Appellants, v.
ANA MATOSANTOS, as Director, etc., et al., Defendants and Respondents.

[No. C065329. Third Dist. Jan. 24, 2013.]

CALIFORNIA REDEVELOPMENT ASSOCIATION, Plaintiff and Respondent, v.
ANA MATOSANTOS, as Director, etc., Defendant and Appellant.

[No. C065390. Third Dist. Jan. 24, 2013.]

COUNTY OF LOS ANGELES et al., Plaintiffs and Appellants, v.
ANA MATOSANTOS, as Director, etc., et al., Defendants and Respondents.

Counsel

Best Best & Krieger; McDonough Holland & Allen, Richard E. Brandt, T. Brent Hawkins, Ann Taylor Schwing; Nielsen, Merksamer, Parrinello, Mueller & Naylor, Steven A. Merksamer, Richard D. Martland; Greenberg Traurig and Scott D. Bertzyk for Plaintiffs and Appellants in No. C064907.

Meyers, Nave, Riback, Silver & Wilson, J. Scott Smith, Robin Paige Donoghue and Susan E. Bloch for League of California Cities as Amicus Curiae on behalf of Plaintiffs and Appellants in No. C064907.

Greenberg Traurig, Scott D. Bertzyk, Nancy Doig, Karin L. Bohmholdt; Andrea Sheridan Ordin, County Counsel, Elizabeth M. Cortez, Assistant County Counsel, and Thomas M. Tyrrell, Deputy County Counsel, for Plaintiffs and Appellants in No. C065390.

Altshuler Berzon, Scott A. Kronland and Caroline P. Cincotta for State Building & Construction Trades Council of California as Amicus Curiae on behalf of Plaintiffs and Appellants in No. C065390.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorney Generals, Douglas J. Woods and Jonathan K. Renner, Assistant Attorneys General, Zackery P. Morazzini, Stephen P. Acquisto and George Waters, Deputy Attorneys General, for Defendant and Appellant in No. C065329.

Best Best & Krieger, Richard E. Brandt, T. Brent Hawkins, Ann Taylor Schwing; Nielsen, Merksamer, Parrinello, Gross & Leoni, Steven A. Merksamer and Richard D. Martland for Plaintiff and Respondent in No. C065329.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorney Generals, Douglas J. Woods and Jonathan K. Renner, Assistant Attorneys General, Zackery P. Morazzini, Stephen P. Acquisto, George Waters and Seth E. Goldstein, Deputy Attorneys General, for Defendants and Respondents in No. C064907.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, and Seth E. Goldstein, Deputy Attorney General, for Ana Matosantos, Director of the Department of Finance, as Amicus Curiae on behalf of Defendants and Respondents in No. C064907.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Kimberly J. Graham and Seth E. Goldstein, Deputy Attorneys General, for Defendants and Respondents in No. C065390.

## Opinion

**HULL, J.**—Responding to a fiscal emergency declared by the Governor on July 1, 2009, the Legislature enacted Assembly Bill No. 4X 26 (2009–2010 4th Ex. Sess.), requiring redevelopment agencies throughout the state to contribute portions of their property tax increment funding for the 2009–2010 and 2010–2011 fiscal years into supplemental educational revenue augmentation funds (SERAF's) to be used for financing K-12 education in redevelopment areas. (Assem. Bill No. 4X 26 (2009–2010 4th Ex. Sess.) (hereafter Assembly Bill 4X 26), enacted as Stats. 2009, 4th Ex. Sess. 2009–2010, ch. 21, §§ 6–9.) However, because Assembly Bill 4X 26 further required that the funds deposited in SERAF's be counted toward the state's overall obligation to fund education, the legislation effected no net increase in school funding. Instead, redevelopment agencies were forced to transfer funds to the state General Fund as reimbursement for other state-funded local programs.

In these consolidated appeals, we conclude the Legislature acted within its constitutional authority in directing redevelopment agencies to deposit portions of their property tax funding into SERAF's. In *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231 [135 Cal.Rptr.3d 683, 267 P.3d 580] (*Matosantos*), the California Supreme Court upheld the Legislature's power to dissolve redevelopment agencies altogether. Inherent in the power to dissolve is the power to limit funding available to redevelopment agencies. And because Assembly Bill 4X 26 does not otherwise violate constitutional limitations on the use of property taxes or impair contractual obligations of redevelopment agencies or their successors, we conclude it is a valid exercise of the Legislature's inherent budgetary powers.

In a related matter, we conclude the trial court erred in awarding attorney fees to the prevailing plaintiffs in connection with a challenge to an earlier legislative attempt to reallocate property tax funding from redevelopment agencies to the state.

Facts and Proceedings

*Legislative Background*

"In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay." (*Matosantos, supra,* 53 Cal.4th at p. 245.) The Community Redevelopment Law (CRL) (Health & Saf. Code, § 33000 et seq.; further undesignated section references are to the Health and Safety Code) was designed to assist local governments in revitalizing blighted areas. (*City of Cerritos v. Cerritos Taxpayers Assn.* (2010) 183 Cal.App.4th 1417, 1424 [108 Cal.Rptr.3d 386].)

In 1952, following voter approval, the CRL became part of the California Constitution as article XIII, section 19, later renumbered article XVI, section 16. (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 866, fn. 7 [62 Cal.Rptr.3d 614, 161 P.3d 1168]; further undesignated article references are to the California Constitution.) By the end of 2011, there were nearly 400 redevelopment agencies operating in the state. (*Matosantos*, at p. 246.)

Redevelopment agencies may "prepare and carry out plans for the improvement, rehabilitation, and redevelopment of blighted areas" (§ 33131, subd. (a)) by acquiring real property (§ 33391, subd. (b)), clearing land and constructing infrastructure necessary for building on project sites (§§ 33420, 33421), undertaking certain improvements to other public facilities in the project areas (§ 33445), and disposing of property by lease or sale (§§ 33430, 33431).

Because redevelopment agencies generally cannot levy taxes (*Huntington Park Redevelopment Agency v. Martin* (1985) 38 Cal.3d 100, 106 [211 Cal.Rptr. 133, 695 P.2d 220]), "they rely on tax increment financing, a funding method authorized by article XVI, section 16 . . . and section 33670. [Citations.] Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the redevelopment agency for repayment of debt incurred to finance the project. [Citations.] In essence, property tax revenues for entities other than the redevelopment agency are frozen, while revenue from any increase in value is awarded to the redevelopment agency on the theory that the increase is the result of redevelopment." (*Matosantos, supra*, 53 Cal.4th at pp. 246–247.) In this way, "the redevelopment project in effect pays for itself." (*Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 71 [89 Cal.Rptr.2d 10].)

"The property tax increment revenue received by a redevelopment agency must be held in a special fund for repayment of indebtedness (§ 33670, subd. (b)), but the law does not restrict the amount of tax increment received in a given year to that needed for loan repayments in that year. [Citation.] The only limit on the annual increment payment received is that it may not exceed the agency's total debt, less its revenue on hand. (§ 33675, subd. (g).) Once the entire debt incurred for a project has been repaid, all property tax revenue in the project area is allocated to local taxing agencies according to

the ordinary formula. (§ 33670, subd. (b).)" (*Matosantos, supra*, 53 Cal.4th at p. 247, italics omitted.)

At the time the CRL was adopted, local governments had exclusive control over property tax (art. XIII, former § 10, enacted by Sen. Const. Amend. No. 1, Gen. Elec. (Nov. 8, 1910)), with each local jurisdiction (city, county, special district, and school district) having the power to levy its own property tax. (*Matosantos, supra*, 53 Cal.4th at p. 243.) However, because of inherent inequities in property taxes from jurisdiction to jurisdiction, the California Supreme Court invalidated this scheme of financing for schools on equal protection grounds in *Serrano v. Priest* (1971) 5 Cal.3d 584, 608–609 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*) and *Serrano v. Priest* (1976) 18 Cal.3d 728, 765–766 [135 Cal.Rptr. 345, 557 P.2d 929] (*Serrano II*). "The *Serrano* decisions threw 'the division of state and local responsibility for educational funding' into ' "a state of flux." ' [Citation.] In their aftermath, a 'Byzantine' system of financing [citation] evolved in which the state became the principal financial backstop for local school districts. Funding equalization was achieved by capping individual districts' abilities to raise revenue and enhancing state contributions to ensure minimum funding levels." (*Matosantos, supra*, 53 Cal.4th at p. 243.)

"A second event of seismic significance followed shortly after, with the voters' 1978 adoption of Proposition 13 (Cal. Const., art. XIII A, added by Prop. 13, as approved by voters, Primary Elec. (June 6, 1978).) . . . Proposition 13 capped ad valorem real property taxes imposed by all local entities at 1 percent (Cal. Const., art. XIII A, § 1, subd. (a)), reducing the amount of revenue available by more than half [citation]. In place of multiple property taxes imposed by multiple political subdivisions, it substituted a single tax to be collected by counties and thereafter apportioned. [Citation.] Significantly, Proposition 13 did not specify how that 1 percent was to be divided, instead leaving the method of allocation to state law." (*Matosantos, supra*, 53 Cal.4th at p. 244.) Thus, Proposition 13 largely transferred control over local government financing to the state, thereby "converting the property tax from a nominally local tax to a de facto state-administered tax subject to a complex system of intergovernmental grants." (53 Cal.4th at p. 244.) Proposition 13 also created a zero-sum game in which local governmental entities must compete against each other for a slice of the diminished property tax pie. (53 Cal.4th at pp. 244–245.)

Adding a further complication to the local funding picture, the voters approved Proposition 98 in 1988, thereby establishing "constitutional minimum funding levels for education and requir[ing] the state to set aside a designated portion of the General Fund for public schools. (Cal. Const., art. XVI, § 8 . . . .) Two years later, the voters revised and effectively increased

the minimum funding requirements for public schools. (Prop. 111, as approved by voters, Primary Elec. (June 5, 1990) . . . .)" (*Matosantos, supra,* 53 Cal.4th at p. 245, citations omitted.) "In response to these rising educational demands on the state treasury, the Legislature in 1992 created county educational revenue augmentation funds (ERAF's). [Citations.] It reduced the portion of property taxes allocated to local governments, deposited the difference in the ERAF's, deemed the balances part of the state's General Fund for purposes of satisfying Proposition 98 obligations, and distributed these amounts to school districts." (*Ibid.*) "Periodically thereafter, the Legislature . . . required local government entities to further contribute to the ERAF's in order to defray the state's Proposition 98 school funding obligations." (*Ibid.*)

Over the years, and especially after the passage of Proposition 13, the use of redevelopment agencies to finance local economic development has proven a powerful weapon for cities in the zero-sum game for allocating scarce funding, at the expense of school districts and other local taxing agencies. (*Matosantos, supra,* 53 Cal.4th at pp. 247–248.) By the end of 2011, redevelopment agencies were receiving 12 percent of all property tax revenue collected in the state. (*Id.* at p. 247.) In light of Proposition 98's requirement that the state provide minimum levels of school financing, the diversion of funds to redevelopment agencies created increasing obligations on the state's General Fund. (53 Cal.4th at p. 248.)

In response to these increased obligations, the Legislature has required redevelopment agencies to allocate tax increment revenues for other local purposes, such as low- and moderate-income-housing, and to make graduated payments to other local agencies for redevelopment projects adopted or expanded after 1994. (*Matosantos, supra,* 53 Cal.4th at pp. 247–248.)

In the general election of November 2004, the electorate approved Proposition 1A (hereafter Proposition 1A), which added article XIII, section 25.5 to the state Constitution. (Stats. 2004, res. ch. 133; *Matosantos, supra,* 53 Cal.4th at p. 249.) Proposition 1A prohibits the Legislature from enacting any law that modifies the manner of allocating property tax revenues "so as to reduce for any fiscal year the percentage of the total amount of ad valorem property tax revenues in a county that is allocated among all of the local agencies in that county below the percentage of the total amount of those revenues that would be allocated among those agencies for the same fiscal year" under the laws in effect before the adoption of Proposition 1A. (Art. XIII, § 25.5, subd. (a)(1)(A); Stats. 2004, res. ch. 133, p. 7576.) In effect, Proposition 1A prohibits the Legislature from raiding local property tax allocations to help balance the budget.

However, Proposition 1A permits suspension of this prohibition under certain conditions for any two out of 10 consecutive years beginning in fiscal year 2008–2009. (Art. XIII, § 25.5, subd. (a)(1)(B) & (C); Stats. 2004, res. ch. 133, p. 7576.) Proposition 1A also does not apply to redevelopment agencies. (*Matosantos, supra,* 53 Cal.4th at p. 249.) Accordingly, the Legislature continued to require redevelopment agencies to make ERAF (educational revenue augmentation fund) payments for the benefit of school and community college districts. "In each of the 2004–2005 and 2005–2006 fiscal years, redevelopment agencies were charged amounts intended to generate a combined $250 million." (*Id.* at p. 248.)

*Assembly Bill No. 1389*

In the 2008–2009 fiscal year, the Legislature approved Assembly Bill No. 1389 (2007–2008 Reg. Sess.) (hereafter Assembly Bill 1389) which, among other things, enacted sections 33685 through 33689, which required the transfer of a combined $350 million from redevelopment agencies to ERAF's. (Stats. 2008, ch. 751, §§ 53–57; *Matosantos, supra,* 53 Cal.4th at p. 248.)

California Redevelopment Association (CRA), the Community Redevelopment Agency of the City of Moreno Valley (Moreno Valley RA), the Madera Redevelopment Agency (Madera RA), and John Shirey, an individual taxpayer, initiated a mandamus proceeding against the Director of the Department of Finance (Director) and the Auditor-Controller of Riverside County, seeking to block enforcement of sections 53 through 57 of Assembly Bill 1389. (*California Redevelopment Assn. v. Matosantos* (Super. Ct. Sacramento County, 2010, No. 34-2008-00028334-CU-WM-GDS) (hereafter *CRA v. Matosantos I*).)

According to the petition in *CRA v. Matosantos I*, CRA is a California nonprofit corporation established in 1979 whose members are redevelopment agencies and whose associate members are businesses having interests in redevelopment activities. Moreno Valley RA and Madera RA are community redevelopment agencies under the CRL suing on behalf of themselves and all other redevelopment agencies in the state and the residents and businesses within the jurisdictions of such agencies.

On April 30, 2009, the trial court issued its decision in *CRA v. Matosantos I*, granting the requested relief and invalidating the transfer of tax increment funds from the redevelopment agencies to the ERAF's under Assembly Bill 1389. The court explained article XVI, section 16 prohibits the use of tax

increment funds for other than redevelopment purposes. The court further explained Assembly Bill 1389 contains no provisions assuring that funds transferred to the ERAF's will be used for educational purposes solely within the redevelopment project areas. The court entered judgment for the plaintiffs, finding sections 33685 through 33689 unconstitutional and enjoining the defendants from enforcing those provisions. The court reserved jurisdiction on the issue of attorney fees for the prevailing plaintiffs.

The Director filed a notice of appeal from the trial court's decision. The plaintiffs moved for an award of attorney fees in the amount of $629,408.48, pursuant to Code of Civil Procedure section 1021.5 and section 1988 of title 42 of the United States Code. The trial court deferred ruling on the motion for attorney fees until resolution of the Director's appeal. On September 23, 2009, the Director abandoned the appeal.

The trial court thereafter determined the plaintiffs are not entitled to attorney fees under section 1988 of title 42 of the United States Code, because its ruling on the merits was based on state law alone. However, the court then issued an order awarding the plaintiffs attorney fees pursuant to Code of Civil Procedure section 1021.5 in the amount of $316,622.74, approximately half of the amount sought. The court found that at least half of the hours detailed in the plaintiffs' billing statements were either unnecessary or unrelated to the relief obtained in the litigation. The Director appeals from the order awarding attorney fees.

*Assembly Bill 4X 26*

For fiscal years 2009–2010 and 2010–2011, the Legislature again sought to appropriate tax increment funds from redevelopment agencies to help balance the budget. In doing so, the Legislature expressly sought to avoid the deficiencies in Assembly Bill 1389 identified by the trial court in *CRA v. Matosantos I.* Section 1 of Assembly Bill 4X 26 declares: "It is the intent of the Legislature in enacting this act to create a procedure to ensure that the funds contributed by a redevelopment agency pursuant to this act are allocated to serve persons living within or in the vicinity of any project area of that redevelopment agency." (Stats. 2009, 4th Ex. Sess. 2009–2010, ch. 21, § 1(b).)

Assembly Bill 4X 26 added sections 33690 and 33690.5 to the Health and Safety Code. (Stats. 2009, 4th Ex. Sess. 2009–2010, ch. 21.) Among other things, section 33690 required the various redevelopment agencies to remit, prior to May 10, 2010, an aggregate $1.7 billion to SERAF's. (§ 33690, subd. (a).) It also required county auditor-controllers to distribute the funds in the SERAF's to K-12 school districts or county offices of education located

partially or entirely within the project areas of the redevelopment agencies. (§ 33690, subd. (j)(1).) Such school districts or county offices of education are in turn directed to use such funds for pupils living in the applicable redevelopment areas or in housing supported by redevelopment agency funds. (§ 33690, subd. (j)(5).)

However, section 33690 also provides that the amount of property tax revenues otherwise apportioned to the affected school districts shall be reduced by the amount of SERAF funds received (§ 33690, subd. (k)(1)), thereby resulting in no net increase or decrease in funding to those school districts.

In order to avoid any problems with the requirement of article XVI, section 16, that tax increment funds be used for redevelopment activities, Assembly Bill 4X 26 added section 33020.5, which defines "redevelopment" to include "payments to school districts in the fiscal years specified in Sections 33690 and 33690.5." (§ 33020.5.) Assembly Bill 4X 26 also provides that redevelopment agencies are not required to use tax increment funds to fulfill their obligation to the SERAF's, but may use "reserve funds, proceeds of land sales, proceeds of bonds or other indebtedness, lease revenues, interest, and other earned income." (§ 33690, subd. (b).) To ameliorate any adverse financial effects on redevelopment agencies from the transfer of funds mandated by Assembly Bill 4X 26, new section 33331.5 provides that, upon full payment by a redevelopment agency into an SERAF, the legislative body that created the redevelopment agency may amend the redevelopment plan to extend the time limits for completion of redevelopment activities by one year. (§ 33331.5.)

For fiscal year 2010–2011, new section 33690.5 required the redevelopment agencies to remit an additional $350 million to the SERAF's by May 10, 2011. (§ 33690.5, subd. (a).) These funds again would be used to reduce the state's obligation to fund education. (See § 33690.5, subds. (j)(1), (5), (k)(1).)

Assembly Bill 4X 26 also added section 33691, which provides that a given redevelopment agency may reduce its required transfer to the SERAF under section 33690 or 33690.5 by whatever amount is necessary to allow the agency to pay "existing indebtedness," which is defined as the amount due *in the given fiscal year* on bonds and other such obligations previously incurred by the agency. (§ 33691, subds. (a)(1), (b).) In effect, current fiscal year debt payments, but not the amount of the overall debt obligations, are given priority over SERAF payments.

On October 20, 2009, the Community Redevelopment Agency of the City of Union City (Union City RA) and Fountain Valley Agency for Community Development (Fountain Valley RA), on behalf of themselves and all other California redevelopment agencies, along with CRA and John Shirey (hereafter collectively the CRA Plaintiffs), initiated a mandamus action against the Director and the Auditor-Controller of Alameda County, on behalf of himself and all other auditors in California counties having redevelopment agencies, seeking to block enforcement of Assembly Bill 4X 26. (*California Redevelopment Assn. v. Matosantos* (Super. Ct. Sacramento County, 2010, No. 34-2009-80000359-CU-WM-GDS (hereafter *CRA v. Matosantos II*).) The CRA Plaintiffs allege, among other things, that Assembly Bill 4X 26 violates article XVI, section 16, and Propositions 13 and 1A.

Two days later, the Counties of Los Angeles, San Diego, San Bernardino, San Mateo, Riverside, Orange and Alameda, along with Don Knabe (hereafter collectively the County Plaintiffs), initiated a separate mandamus action against the Director and the Auditor-Controller of Alameda County seeking to block enforcement of Assembly Bill 4X 26. (*County of Los Angeles v. Matosantos* (Super. Ct. Sacramento County, 2010, No. 34-2009-80000362-CU-WM-GDS (hereafter *County v. Matosantos*).) As in *CRA v. Matosantos II*, the Auditor-Controller of Alameda County was sued on behalf of himself and as the representative of all other auditors of California counties having redevelopment agencies.

On November 2, 2009, the trial court determined *CRA v. Matosantos II* and *County v. Matosantos* are related and assigned both cases to Judge Connelly, who had presided over *CRA v. Matosantos I*.

On December 18, 2009, in *County v. Matosantos*, the trial court certified a defendant class of county auditors in the 51 California counties having redevelopment agencies.

On January 22, 2010, in *CRA v. Matosantos II*, the trial court certified a plaintiff class of California redevelopment agencies and a defendant class of county auditors.

On February 5, 2010, the trial court conducted a hearing on both matters, at the end of which it requested supplemental briefing.

On March 30, 2010, the CRA Plaintiffs moved for a preliminary injunction or stay to maintain the status quo in order to prevent the scheduled transfer of tax increment funds on or before May 10. The County Plaintiffs joined in the motion.

In lieu of ruling on the motion for preliminary injunction or stay, the trial court issued its ruling on the merits of the plaintiffs' petitions on May 4, 2010. The court first found no violation of article XVI, section 16's requirement that all tax increment funds be used for redevelopment purposes. The court deferred to the Legislature's explanation and specification in Assembly Bill 4X 26 designating funding for local schools as part of the redevelopment process and explained that the fact the transfer of funds also relieves the state of some school funding obligations does not invalidate the legislation.

The court next concluded Assembly Bill 4X 26 does not unconstitutionally impair the redevelopment agencies' contractual obligations to bondholders, inasmuch as SERAF payments are subordinated to liens on redevelopment property and current fiscal year debt payments and SERAF payments are not required to be made from tax increment funds. The court further found no violation of Proposition 1A, inasmuch as redevelopment agencies do not fall within the scope of its protection. Although the plaintiffs also argued Assembly Bill 4X 26 permits the extension of redevelopment agency obligations for one year, which could result in a decrease in funding to the sponsoring agency as prohibited by Proposition 1A, the court concluded the significance of this delay is too uncertain. Finally, the court found no other constitutional infirmity in Assembly Bill 4X 26. In light of its ruling, the court denied the plaintiffs' request for a stay of the scheduled May 10, 2010 transfer of funds.

On May 5, 2010, the CRA Plaintiffs filed a petition in this court for supersedeas or mandate to block enforcement of the trial court's judgment and to maintain the status quo pending appeal. On May 7, we denied the petition.

On May 13, 2010, the trial court entered judgment denying the petitions in *CRA v. Matosantos II* and *County v. Matosantos*. The plaintiffs in both cases appeal.

*Proposition 22*

In November 2010, the voters approved Proposition 22 which, among other things, added section 25.5, subdivision (a)(7), to article XIII of the state Constitution, extending the protections of Proposition 1A to redevelopment agencies. (*Matosantos, supra*, 53 Cal.4th at p. 249.)

*Assembly Bills 1X 26 and 1X 27*

In the summer of 2011, the Legislature enacted two measures to reduce or eliminate the diversion of property tax revenues from school districts to redevelopment agencies. (Assem. Bill Nos. 1X 26 & 1X 27 (2011–2012 1st

Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011–2012, chs. 5–6 (hereafter Assembly Bill 1X 26 and Assembly Bill 1X 27).) "Assembly Bill 1X 26 bars redevelopment agencies from engaging in new business and provides for their windup and dissolution. Assembly Bill 1X 27 offers an alternative: redevelopment agencies can continue to operate if the cities and counties that created them agree to make payments into funds benefiting the state's schools and special districts." (*Matosantos, supra*, 53 Cal.4th at p. 241.)

In December 2011, the California Supreme Court issued its decision in *Matosantos*, upholding Assembly Bill 1X 26 (*Matosantos, supra*, 53 Cal.4th at pp. 262, 264) but finding Assembly Bill 1X 27 in violation of Proposition 22 (*Matosantos*, at p. 270). The court also found the two provisions severable. (53 Cal.4th at p. 270.) As reformed by the court, Assembly Bill 1X 26 required all redevelopment agencies to dissolve effective February 1, 2012. (*Matosantos*, at p. 275.) Since that date has now passed, all redevelopment agencies, including those that were parties to the present consolidated proceedings, have ceased to exist.

DISCUSSION

I

*Attorney Fees in* CRA v. Matosantos I

■ As explained above, article XVI, section 16, authorizes the Legislature to grant redevelopment agencies tax increment funds up to the amount of their total indebtedness. (*Matosantos, supra*, 53 Cal.4th at pp. 258–259.) Such funds are to be placed in a special account for the payment of principal and interest on loans and other indebtedness incurred in connection with redevelopment activities. (Art. XVI, § 16, subd. (b).)

On April 30, 2009, the trial court in *CRA v. Matosantos I* issued its decision granting the requested relief and invalidating the transfer of $350 million in tax increment funds from the redevelopment agencies to the ERAF's. The court explained "the required payments by [redevelopment agencies] to their county ERAF's during the 2008–2009 fiscal year are inconsistent with the intent of [article XVI,] section 16 to use tax increment revenue for the financing of redevelopment projects . . . ." This was so, according to the court, because there was no assurance in the legislation that the applicable funds would be used for the benefit of the redevelopment areas alone. The court thereafter entered judgment for the plaintiffs, finding sections

33685 through 33689 unconstitutional and enjoining the defendants from enforcing those provisions.

The plaintiffs moved for an award of attorney fees in the amount of $629,408.48, pursuant to Code of Civil Procedure section 1021.5 and section 1988 of title 42 of the United States Code. The trial court concluded CRA is entitled to attorney fees under the state provision but not the federal one. The court further found that at least half of the hours detailed in the billing statements submitted by the plaintiffs were either unnecessary or unrelated to the relief obtained in the litigation. The court awarded CRA $316,622.74, which was about half of what had been requested.

Code of Civil Procedure section 1021.5 reads: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, or of enforcement by one public entity against another public entity, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. . . ."

■ "[Code of Civil Procedure s]ection 1021.5 codifies the 'private attorney general' doctrine under which attorney fees may be awarded to successful litigants. 'The doctrine rests upon the recognition that privately initiated lawsuits are often essential to the effectuation of the fundamental public policies embodied in constitutional or statutory provisions, and that, without some mechanism authorizing the award of attorney fees, private actions to enforce such important public policies will as a practical matter frequently be infeasible. [Citations.]' [Citation.] Entitlement to fees under [Code of Civil Procedure] section 1021.5 requires a showing that the litigation: '(1) served to vindicate an important public right; (2) conferred a significant benefit on the general public or a large class of persons; and (3) imposed a financial burden on plaintiffs which was out of proportion to their individual stake in the matter.' [Citation.]

"The decision whether to award attorney fees lies within the discretion of the trial court and will not be disturbed on appeal absent a prejudicial abuse of discretion resulting in a manifest miscarriage of justice. [Citation.] However, 'discretion may not be exercised whimsically and, accordingly, reversal is appropriate "where no reasonable basis for the action is shown." [Citation.]' [Citation.]" (*California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 568–569 [35 Cal.Rptr.2d 396], fn. omitted (*California Licensed Foresters*).)

The Director contends the third requirement for an award of attorney fees is not satisfied here, because "CRA's stake in pursuing this litigation—$350 million—dwarfed the financial burden of pursuing it." The plaintiffs in *CRA v. Matosantos I* (hereafter the CRA Respondents) disagree, asserting the cost of litigating this matter—over $650,000—exceeded CRA's entire net worth of $488,856. According to the CRA Respondents, litigation of this dispute by them was necessary because "[n]o single agency or small group of agencies could have challenged [Assembly Bill 1389] because the costs were too great, the individual burden too heavy and the resources too limited." The CRA Respondents further assert the Director's argument about CRA's financial stake in the litigation betrays a fundamental misunderstanding of how tax increment funding works. According to the CRA Respondents, such funds are not allocated to the individual redevelopment agencies but to special funds for the payment of debt obligations. Thus, "[t]he taxing entities and the project creditors, not the redevelopment agencies, are the parties with the financial stake in the tax increment and the parties that benefit from preservation of $350 million of tax increment for redevelopment of project areas . . . ."

The trial court agreed with the CRA Respondents, explaining: "Contrary to the contention of [the Director], petitioner CRA's prosecution of the litigation imposed a financial burden disproportionate to its stake in the litigation. Whether the CRA is considered to be a public entity by virtue of its redevelopment agency membership or a private, non-profit corporation representing redevelopment agencies as well as private parties having various interests in redevelopment activities, the CRA pursued this litigation in the interest of, not only its organizational membership, but also residents and businesses in redevelopment areas throughout California where tax increment financing plays a key role in fostering redevelopment projects. [Citations.]

"While the cost of the litigation to the CRA was significant, the CRA and its redevelopment agency membership had no identifiable personal financial stake in the $350 million in tax increment revenues preserved by the litigation for use in redevelopment projects[.] Those revenues were committed to redevelopment projects throughout California and had to be used in accordance with the public policies and purposes of the [CRL] administered by the redevelopment agencies. Thus, the litigation could only have been brought to preserve those uses of the revenues, not to protect any personal or private financial interest of the CRA or its members in the revenues. [Citations.]

"Nor did the CRA benefit from specific concrete and significant nonfinancial interest that resulted from the preservation of the $350 million in tax increment revenues. There is no evidence that the CRA was motivated to pursue this litigation for any other reason than to enforce the constitutional

and related statutory provisions governing tax increment financing of redevelopment projects—looking beyond any specific concrete and significant effect on its 'parochial interests to the greater public good.' [Citation.] This relatively abstract interest transcended the disproportionate burdens of the litigation on the CRA."

Before addressing the parties' contentions, we note that the motion for attorney fees in the court below was filed on behalf of not just CRA but two other plaintiffs, including a redevelopment agency. Without explanation, the trial court entered an order awarding fees only to CRA. Based on the record before us, it appears the billing submitted by the plaintiffs in support of their motion for attorney fees was for work performed by counsel on behalf of all plaintiffs, not just CRA. We fail to see how the trial court could have singled out CRA as deserving of a fee award while ignoring the other plaintiffs. At any rate, as we shall explain, we conclude none of the plaintiffs were entitled to an award of attorney fees.

The CRA Respondents' arguments in support of the award, and the trial court's explanation of its ruling, are apparently based on two factors: (1) CRA must be viewed in isolation and not as simply a conduit for its members' interests and (2) the $350 million protected by the judgment was not for the benefit of CRA or its members but for the bondholders and other creditors who will be paid out of those funds. However, neither basis withstands scrutiny.

The CRA Respondents assert "[n]o agency or individual could afford to challenge [Assembly Bill 1389] alone," so "[t]he financial burden of the challenge fell to CRA." Thus, the CRA Respondents would have us look to CRA alone and not its individual members, including the two redevelopment agency plaintiffs, to determine whether the financial burden placed upon CRA was out of proportion to its individual stake in the matter. And since CRA has no stake in the outcome of the litigation apart from that of its members, so the argument goes, the cost of litigation was obviously out of proportion to CRA's stake.

In support of their argument that a nonprofit organization such as CRA may recover attorney fees under Code of Civil Procedure section 1021.5 regardless of its members' stake in the litigation, the CRA Respondents cite *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158 [188 Cal.Rptr. 104, 655 P.2d 306] (*PLF*); *Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668 [186 Cal.Rptr. 589, 652 P.2d 437] (*Folsom*); *State Water Resources Control Bd. Cases* (2008) 161 Cal.App.4th 304 [73 Cal.Rptr.3d 842] (*Water Board Cases*); and *Riverside Sheriffs' Assn. v.*

*County of Riverside* (2007) 152 Cal.App.4th 414 [61 Cal.Rptr.3d 295] (*Riverside Sheriffs*). However, as we shall explain, those cases are all inapposite.

*PLF* involved two actions against the California Coastal Commission, one filed by the Pacific Legal Foundation and a group of property owners and another filed by two property owners (Jackson and Hunter), challenging commission regulations affecting the rights of coastal property owners. In addition to pursuing its own action, Pacific Legal Foundation represented Jackson and Hunter in their case, which sought to overturn a commission requirement of public access as a condition to approval of a permit. (*PLF, supra*, 33 Cal.3d at p. 164.) In the Jackson and Hunter matter, the Supreme Court concluded Pacific Legal Foundation was not entitled to attorney fees under Code of Civil Procedure section 1021.5, despite having obtained a judgment invalidating the permit condition. According to the court, the decision did not confer a significant benefit on a large class of persons but instead vindicated the rights of the owners of a single parcel of property. (33 Cal.3d at p. 167.)

*PLF* is obviously inapposite to the present matter, as it involved application of the second requirement for a Code of Civil Procedure section 1021.5 award—the matter conferred a significant benefit on the general public or a large class of persons—and not the third requirement at issue here. Furthermore, it does not support the CRA Respondents' position because the high court concluded attorney fees were *not* warranted under the circumstances presented.

In *Folsom*, the plaintiffs were elderly or disabled individuals dependent on public transit who brought a declaratory relief action challenging the county's allocation of street and road project funds and obtained relief by way of a settlement agreement. (*Folsom, supra*, 32 Cal.3d at p. 671.) In the litigation, the plaintiffs were represented by Legal Services of Northern California and other public entities. (*Id.* at p. 681, fn. 22.) On the issue of the plaintiffs' right to attorney fees, the court first concluded the fact the plaintiffs were represented by public entities did not bar such an award. (*Id.* at pp. 683–684.) The court thereafter concluded the plaintiffs had been successful in the litigation, notwithstanding the settlement and voluntary actions by the defendants. (*Id.* at pp. 686–687.) Notably, the court did not consider the question whether the burden on the litigants exceeded their personal stake in the matter, thus distinguishing it from the present case.

*Water Board Cases* involved seven consolidated cases arising out of an omnibus water rights proceeding before the State Water Resources Control Board (SWRCB). One of the cases was brought by five private, nonprofit

organizations (the Audubon Society parties) alleging the failure of SWRCB to comply with a 1995 bay-delta plan for waterflows. Another of the coordinated actions was filed by six parties (the Central Delta parties), several of whom were local water agencies. It was ultimately determined that both the Audubon Society parties and the Central Delta parties were entitled to the same relief against the SWRCB. The trial court later denied the Audubon Society parties' motion for attorney fees, concluding there was no necessity for private enforcement, inasmuch as the relief they obtained was no more than what the Central Delta parties had obtained. (*Water Board Cases, supra,* 161 Cal.App.4th at pp. 306–307.)

This court reversed the denial of attorney fees to the Audubon Society parties. We explained that, where "a public entity receives fees under [Code of Civil Procedure] section 1021.5 for succeeding in important public interest litigation, a private party who succeeded alongside that public entity cannot be denied a similar award of fees simply because the success might have been achieved by the public entity acting alone." (*Water Board Cases, supra,* 161 Cal.App.4th at p. 318.)

*Water Board. Cases* too is inapposite as it dealt with a different requirement for an award of attorney fees, to wit, whether the necessity of private enforcement is such as to make an award appropriate. There was no question as to whether the financial burden placed on the plaintiffs was out of proportion to their individual stakes in the matter.

Finally, in *Riverside Sheriffs*, the sheriffs' association brought an action to enforce the rights of several officers to representation which had been denied during a criminal investigation of sexual improprieties, and the trial court issued an injunction prohibiting such denial. The court thereafter awarded the association attorney fees, and the county defendant appealed. (*Riverside Sheriffs, supra,* 152 Cal.App.4th at pp. 417–419.) The Court of Appeal affirmed the award of attorney fees concluding, among other things, that the trial court did not abuse its discretion in awarding attorney fees where the association enforced an important procedural right for its members and bore the entire financial burden of the litigation without seeking or receiving any pecuniary recovery. (*Id.* at pp. 423–424.)

Although the court in *Riverside Sheriffs* made a finding based on the third requirement for an award of attorney fees, the question there was not whether the court could ignore pecuniary benefits to the individual members of the association and rely instead on the fact the association itself did not receive a financial benefit. In fact, in reaching its decision, the court relied on other

cases in which attorney fees were permitted where individual police officers enforced their own procedural rights or their right to backpay. (See, e.g., *Otto v. Los Angeles Unified School Dist.* (2003) 106 Cal.App.4th 328, 333 [130 Cal.Rptr.2d 512]; *Aguilar v. Johnson* (1988) 202 Cal.App.3d 241, 252–253 [247 Cal.Rptr. 909]; *Henneberque v. City of Culver City* (1985) 172 Cal.App.3d 837, 846–847 [218 Cal.Rptr. 704].)

Thus, none of the cases cited by the CRA Respondents supports their assertion that the court may ignore the financial stake of an organization's members in deciding whether the financial burden on the plaintiffs was out of proportion to their individual stakes in the litigation.

In *California Licensed Foresters*, the California Licensed Foresters Association (CLFA) brought an action challenging emergency regulations and guidelines adopted by the State Board of Forestry which were allegedly detrimental to the interests of CLFA's members, and CLFA obtained a preliminary injunction against enforcement. However, after permanent regulations were adopted, CLFA filed a request for dismissal and later requested and obtained an award of attorney fees. (*California Licensed Foresters, supra,* 30 Cal.App.4th at pp. 567–568.)

On appeal to this court, we reversed the award of attorney fees, concluding CLFA was not entitled to such fees under Code of Civil Procedure section 1021.5 because "[t]he economic interest of CLFA and its members was sufficient motivation for bringing [the] action." (*California Licensed Foresters, supra,* 30 Cal.App.4th at p. 573.) We explained, "CLFA is a nonprofit association of 'registered professional foresters' and related professionals who provide services to private timberland owners in connection with the preparation of [Timber Harvest Plans]." (*Id.* at p. 567.) Like CRA here, CLFA argued "it had no personal motivation for bringing [the] action because, as an entity separate from its members, CLFA had no financial stake in the outcome," and "the $42,940 cost of litigation [was] significantly out of proportion to its exiguous means." (*Id.* at p. 570.) We rejected this argument, explaining: "In its representative capacity, CLFA had a financial stake in pursuing this matter to the same extent as its members. CLFA's very existence depends upon the economic vitality of its members and any benefit or burden derived by CLFA from this lawsuit ultimately redounds to the membership." (*Ibid.*)

The same reasoning applies here. The petition below alleged: "Petitioner CRA is a California nonprofit corporation established in 1979. CRA members are California redevelopment agencies. Currently, approximately 360 redevelopment agencies are CRA members. Associate members of CRA are businesses having an interest in redevelopment activity in California, including

financial institutions, redevelopment consultants, developers, and law firms involved in redevelopment. CRA has approximately 340 associate members. [Citation.] CRA sues on its own behalf and for the benefit of its members."

Like CLFA in *California Licensed Foresters*, CRA had a financial stake in this matter to the same extent as its members. As a membership association, it may be inferred "[CRA's] very existence depends upon the economic vitality of its members and any benefit or burden derived by [CRA] from this lawsuit ultimately redounds to the membership." (*California Licensed Foresters, supra*, 30 Cal.App.4th at p. 570.)

The CRA Respondents nevertheless argue the fact they had a pecuniary interest in the litigation does not disqualify them from an award of attorney fees. They cite as support *Feminist Women's Health Center v. Blythe* (1995) 32 Cal.App.4th 1641 [39 Cal.Rptr.2d 189] (*Blythe*). In *Blythe*, the plaintiff clinic obtained an injunction against abortion protesters and we concluded the record supported the trial court's finding that the women's health clinic did not have a sufficient financial interest in the litigation to preclude an award of attorney fees. (*Blythe*, at pp. 1668–1669.) The clinic "provide[d] gynecological health care, birth control services, pregnancy testing and screening, sexually transmitted disease testing and screening, and abortions." (*Id.* at p. 1654.) Regarding the clinic's financial interest, we explained: "The trial court found plaintiff's year-end surplus of revenues over liabilities for all of its clinics combined together amounted to only $11,914 in 1988, $15,000 in 1989 and $30,353 in 1990. In other words, the financial burden of litigation exceeded plaintiff's net income for a three-year period. Moreover, plaintiff is a nonprofit corporation operating four medical clinics in northern California, and its surpluses are used to subsidize its failing clinics, not to provide dividends for shareholders." (*Id.* at pp. 1667–1668.) We further noted the clinic's primary motivation for pursuing the litigation was not to protect its stream of income but "to ensure its ability to continue providing medical and abortion services to women." (*Id.* at p. 1668.) In particular, the clinic did not seek damages and did not receive any such award in the case. (*Id.* at pp. 1666, 1668.)

*Blythe* too is readily distinguishable from the present matter. Unlike CRA here, the clinic in *Blythe* was not a membership association suing on behalf of its members. The clinic sued on behalf of its customers. Moreover, the clinic in *Blythe* did not receive any monetary recovery in the action, whereas CRA obtained a judgment providing for the retention of $350 million by its members.

The CRA Respondents also cite *Families Unafraid to Uphold Rural El Dorado County v. Board of Supervisors* (2000) 79 Cal.App.4th 505 [94 Cal.Rptr.2d 205] (*Families Unafraid*), disapproved on other grounds in *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1226, footnote 4 [117 Cal.Rptr.3d 342, 241 P.3d 840], where we concluded the trial court abused its discretion in denying an award of attorney fees to an unincorporated association of homeowners who sued the county to block approval of a housing subdivision for failure to comply with the applicable general plan and the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.). We concluded the homeowners' financial stake in the matter by virtue of any decrease in the value of their properties did not disqualify them from an attorney fee award. However, we remanded for reconsideration of whether the plaintiffs' nonfinancial esthetic interests disqualified them from such recovery. (*Families Unafraid*, at pp. 517–520.)

■ *Families Unafraid* is not helpful to the CRA Respondents. Our decision in that case was based on the unexceptional proposition that the trial court must consider all relevant evidence in determining if the cost of litigation was out of proportion to the plaintiffs' personal stake in the matter, both financial and nonfinancial.

The CRA Respondents next cite *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303] (*Serrano III*), where the state high court permitted an award of fees to two public interest legal advocates, Public Advocates, Inc., and Western Center on Law and Poverty, that had represented the plaintiffs—students and their parents—in litigation challenging public school funding in the state. (*Serrano III*, at pp. 31–33 & fn. 4.) The court concluded the award was proper notwithstanding that the plaintiffs had not incurred any obligation to pay legal fees to the two advocates and the advocates received public funding. (See *id.* at pp. 33, 47–48.)

The CRA Respondents contend the *Serrano III* plaintiffs "are equivalent to" the two redevelopment agency plaintiffs and the individual plaintiff in this matter, because they are "individually affected by the unconstitutional acts but not so situated that they could afford to sue individually." However, given that the average recovery of each of the approximately 360 redevelopment agencies represented by CRA is approximately $10 million, it is hard to see such equivalence. The CRA Respondents also contend the two public interest legal advocates in *Serrano III* are "roughly equivalent" to CRA here. We suppose that depends on what is meant by "roughly." The public advocates in *Serrano III* were the attorneys representing the plaintiffs in that case. They had no other relation or affiliation with the plaintiffs. CRA, on the other hand, is an association composed of the individual redevelopment agencies. It is not

the legal counsel for those agencies but rather one of the entities hiring such counsel. Thus, *Serrano III* provides no support for the CRA Respondents.

The CRA Respondents nevertheless contend neither CRA nor its members had any real stake in this action, because the ultimate beneficiaries were the bondholders who will be paid from the recovered funds. However, this argument is like saying a debtor who collects an unrelated debt from a third party is not thereby benefited because the proceeds will ultimately be used to pay the debtor's creditors. Certainly the debtor is benefited to the extent he is not required to look elsewhere for funds to satisfy the debt. If CRA's members had lost the $350 million in funds, it would have had to find other means to satisfy bondholders.

■ We conclude the litigation in *CRA v. Matosantos I* did not impose a burden on CRA and its members out of proportion to their individual stakes in the matter and, hence, CRA is not entitled to an award of attorney fees under Code of Civil Procedure section 1021.5.

Lastly, the CRA Respondents contend that, even if the fee award under Code of Civil Procedure section 1021.5 is invalid, they are entitled to attorney fees under section 1988 of title 42 of the United States Code. They argue they sought an award of attorney fees on the basis of both provisions and they were entitled to an award under the federal law, notwithstanding that the trial court did not rule on their civil rights claim. The CRA Respondents cite as support *Filipino Accountants' Assn. v. State Bd. of Accountancy* (1984) 155 Cal.App.3d 1023, 1032 [204 Cal.Rptr. 913] (*Filipino Accountants*), where we stated a plaintiff who litigates a civil rights claim need not prevail on that claim in order to be entitled to attorney fees under section 1988, "provided that [the] plaintiff's complaint has pleaded a 'substantial' civil rights act claim and [the] plaintiff prevails on a noncivil rights act claim that is factually related to the pleaded civil rights act claim."

The Director makes no attempt to refute the foregoing argument. In her reply brief on appeal, she simply reiterates her arguments regarding the propriety of a fee award under Code of Civil Procedure section 1021.5. Nevertheless, we conclude the CRA Respondents' argument is without merit.

■ As we explained in *Filipino Accountants*, where the plaintiff does not prevail on a civil rights claim, that claim must be factually related to the non-civil-rights claim on which the plaintiff did prevail. The civil rights claim here was based on article I, section 10, clause 1 of the United States Constitution, which prohibits any state law impairing the obligation of

contracts, and on the Fifth Amendment's takings clause. In their amended petition, the CRA Respondents alleged sections 53 through 57 of Assembly Bill 1389 "violate the prohibition on impairing obligations of contracts in Article I § 9 of the California Constitution and in Article I § 10 of the U.S. Constitution." They further alleged those provisions "violate the prohibition on taking property for a public purpose without just compensation in Article I §§ 7 and 19 of the California Constitution and the Fifth Amendment of the U.S. Constitution."

In ruling for the CRA Respondents on their underlying claims, the trial court concluded Assembly Bill 1389 violates the requirement in article XVI, section 16 of the state Constitution that tax increment funds be used exclusively for redevelopment purposes. The court further stated: "Because the court has determined that the section 33865 [*sic*] is facially unconstitutional, the court need not resolve petitioners' contention that the statute also violates the prohibitions on the impairment of contracts and the taking of property without just compensation under the California and United States Constitutions."

It is clear the basis for the trial court's ruling—that the appropriation of funds violates the requirement that such funds be used for redevelopment purposes—is not factually related to claims that the appropriation of such funds constitutes an impairment of contract or a taking of property without just compensation. Hence, CRA is not entitled to an award of attorney fees under section 1988 of title 42 of the United States Code. The trial court made no ruling on any of the issues raised by the federal claim.

Because CRA is not entitled to an award of attorney fees under either the state or the federal provision, the trial court's order granting such fees must be reversed.

II

*Mootness*

Under the terms of Assembly Bill 4X 26, the redevelopment agencies were required to transfer $1.7 billion to the SERAF's by May 10, 2010, and an additional $350 million by May 10, 2011. (§§ 33690, subd. (a), 33690.5, subd. (a).) The CRA Plaintiffs and the County Plaintiffs sought a preliminary injunction or stay in the trial court to block the required transfer of funds. The trial court denied the request for a stay. On May 5, 2010, the CRA Plaintiffs filed a petition in this court for supersedeas or mandate to block enforcement of the trial court's judgment and to maintain the status quo pending appeal.

On May 7, we denied the petition. Presumably, the scheduled transfer of funds occurred on May 10, 2010, and May 10, 2011, as directed.

As described more fully above, in the summer of 2011, the Legislature enacted Assembly Bill 1X 26, providing for the winding down and dissolution of all redevelopment agencies in the state. In December 2011, the California Supreme Court issued its decision in *Matosantos* upholding Assembly Bill 1X 26. (*Matosantos, supra,* 53 Cal.4th at pp. 262, 264.) As reformed by the court, Assembly Bill 1X 26 required all redevelopment agencies to dissolve effective February 1, 2012. (53 Cal.4th at p. 275.) Since that date has now passed, all redevelopment agencies presumably have ceased to exist.

At our request, the parties provided supplemental briefing on the impact of Assembly Bill 1X 26 and *Matosantos* on the present matter.

The Director argues these consolidated appeals are moot because the required transfer of $2.05 billion from the redevelopment agencies to the SERAF's has already taken place and this court can no longer provide effective relief to plaintiffs.

██ " '[T]he duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it. It necessarily follows that when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which renders it impossible for this court, if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment, but will dismiss the appeal.' " (*Consol. etc. Corp. v. United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725], quoting *Mills v. Green* (1895) 159 U.S. 651, 653 [40 L.Ed. 293, 293–294, 16 S.Ct. 132]; accord, e.g., *Simi Corp. v. Garamendi* (2003) 109 Cal.App.4th 1496, 1503 [1 Cal.Rptr.3d 207] ["A case becomes moot when a court ruling can have no practical impact or cannot provide the parties with effective relief."].)

██ The Director argues this matter is moot because courts have no power to order the Legislature to enact a specific appropriation of funds. Hence, this court cannot direct the Legislature to return the $2.05 billion appropriated pursuant to Assembly Bill 4X 26 if we were to determine it was wrongly appropriated. However, the fact we cannot direct the Legislature on a specific appropriation of funds does not mean we are without power to enter a judgment in favor of the various plaintiffs. If that were the case, no money

judgment could ever be entered against the state. Courts may enter such a judgment and leave it to the Legislature to determine how to satisfy it.

The Director also argues the matter is moot by virtue of Assembly Bill 1X 26, which dissolved all redevelopment agencies. She asserts this court cannot provide any meaningful relief in the event we were to decide Assembly Bill 4X 26 is invalid, because there are no longer any redevelopment agencies to whom misappropriated funds may be returned. While acknowledging that Assembly Bill 1X 26 provides for successor agencies to take over the functions of the dissolved redevelopment agencies, the Director argues "these entities exist *only* to pay off [redevelopment agency] indebtedness, [to] dispose of [redevelopment agency] assets, and to wind down the affairs of the [redevelopment agencies]." However, the Director fails to explain how the successor agencies are expected to pay off indebtedness if their funding is taken away. Any relief provided in this action obviously would inure to the benefit of these successor agencies, just as it would have inured to the benefit of the redevelopment agencies had they not been dissolved. Thus, we conclude this matter is not moot.

III

*Article XVI, Section 16*

The primary argument of both the CRA Plaintiffs and the County Plaintiffs is that Assembly Bill 4X 26 violates article XVI, section 16. That constitutional provision authorizes the Legislature to "provide that any redevelopment plan may contain a provision" that the taxes collected on redevelopment project property, "after the effective date of the ordinance approving the redevelopment plan," shall be divided as follows: (a) taxes based on the assessed value of the property before the effective date of the ordinance shall be allocated to "the State of California, any city, county, city and county, district, or other public corporation" and (b) any taxes collected in excess of the foregoing (the tax increment funds) "shall be allocated to and when collected shall be paid into a special fund of the redevelopment agency to pay the principal of and interest on loans, moneys advanced to, or indebtedness (whether funded, refunded, assumed or otherwise) incurred by the redevelopment agency to finance or refinance, in whole or in part, the redevelopment project." (*Ibid.*)

The County Plaintiffs contend Assembly Bill 4X 26 violates article XVI, section 16 by effectively taking tax increment funds allocated to redevelopment agencies and redirecting them to the state to satisfy the state's other obligations. They identify the following trail of funds to support this argument:

(1) Redevelopment agencies are directed to transfer the required funds to SERAF's for the benefit of schools in the redevelopment areas.

(2) County auditors are required to reduce the schools' property tax apportionments by the same amount they receive from the SERAF's, thereby resulting in no net increase in funds to the schools in the redevelopment areas.

(3) The reduced property tax apportionments of the schools are transferred to county supplemental revenue augmentation funds (SRAF's).

(4) The SRAF funds are transferred at the direction of the State Controller to pay for other state-funded services and costs at the local level.

In effect, the County Plaintiffs argue, the funds earmarked by Assembly Bill 4X 26 are transferred from redevelopment agencies, laundered through redevelopment area schools, and wind up in the hands of the state for use in satisfying other state obligations. This, they argue, violates the requirement of article XVI, section 16 that all tax increment funds be used for redevelopment purposes.

The trial court agreed with the County Plaintiffs that article XVI, section 16 prohibits the Legislature from requiring redevelopment districts to use tax increment funds to finance services unrelated to redevelopment projects. However, the court also found article XVI, section 16 leaves it to the Legislature to define the meaning of "redevelopment" and the scope of indebtedness that may be incurred to refinance redevelopment. The court further found the Legislature's determination in Assembly Bill 4X 26 that the SERAF payments are indebtedness incurred to finance redevelopment is entitled to deference. According to the trial court:

"No language in [article XVI,] section 16 restricts the Legislature's definitional discretion, and no case law has constrained the Legislature's past expansive exercise of that discretion to control and direct [redevelopment agencies]' use of tax increment by, for example, requiring [redevelopment agencies] to annually set aside 20 percent of their tax increment for low- and moderate-income housing, to allocate or pass through specified percentages of their tax increment to local taxing agencies affected by redevelopment plans, to limit the duration and amount of tax increment used, or to pay the administrative costs of county auditor-controllers in allocating tax increment revenues to [redevelopment agencies]. [Citation.] Nothing in [article XVI,] section 16 insulates the [redevelopment agencies] from such legislative requirements that control and direct the [redevelopment agencies'] use of tax increment financing to further the purposes of the CRL in eliminating conditions of physical and economic blight in urban neighborhoods.

"Thus, even though the [redevelopment agencies'] use of tax increment to maintain the educational programs and operations of school districts serving residents of redevelopment areas or housing assisted by [redevelopment agencies] may expand the previous legislatively defined scope of indebtedness incurred by [redevelopment agencies] to finance development, [Assembly Bill 4X 26] does not violate [article XVI,] section 16. The findings in section 1 of [Assembly Bill 4X 26] delineate a reasonable basis in fact and logic relating the achievement of economic and residential development objectives to the use of [redevelopment agencies'] SERAF payments to maintain adequate school programs that attract residents, support new businesses and generate employment in redevelopment areas."

The CRA Plaintiffs take issue with the foregoing analysis by the trial court. They argue, among other things, there is no nexus between the funds required to be transferred to redevelopment area schools and the burden on those schools imposed by the redevelopment projects. However, we need not decide if the trial court correctly concluded the SERAF payments constitute redevelopment indebtedness. As we shall explain, contrary to the underlying premise of the trial court's findings, the Legislature was not constrained by article XVI, section 16 to use tax increment funds for redevelopment purposes alone.

In *Matosantos*, the state Supreme Court concluded article XVI, section 16 posed no impediment to the Legislature dissolving all redevelopment agencies. In doing so, the court explained that article XVI, section 16 neither requires creation of redevelopment agencies nor requires that they be allocated tax increment funds. Article XVI, section 16 states the Legislature "may" provide that any redevelopment plan "may" contain a provision allocating tax increment funds to redevelopment agencies.

In *Matosantos*, the high court indicated Article XVI, section 16 "made express the Legislature's authority to authorize property tax increment financing of redevelopment agencies and projects. However, nothing in its text creates an absolute right to an allocation of property taxes." (*Matosantos, supra*, 53 Cal.4th at pp. 256–257.) The court went on to explain: "Article XVI, section 16 does not protect the receipt of tax increment funds up to the amount of a redevelopment agency's total indebtedness, nor does it grant a constitutional right to continue to receive tax increment for as long as redevelopment agencies have debt; rather, it authorizes the Legislature to statutorily grant redevelopment agencies rights to tax increment up to the amount of their total indebtedness. As the Legislature may extend that authorization (and did, in the [CRL]), so it may limit or withdraw that authorization . . . without violating article XVI, section 16." (*Id.* at pp. 258–259.)

What the Legislature did in Assembly Bill 4X 26 was to curtail in part the redevelopment agencies' entitlement to tax increment funds by requiring that a portion of such funds be reallocated elsewhere. This was not inconsistent with article XVI, section 16.

Amicus curiae League of California Cities argues this type of reallocation does in fact violate article XVI, section 16, as interpreted by Proposition 22, which was approved by the electorate in the November 2, 2010 General Election. Proposition 22 added article XIII, section 25.5, section (a)(7), to the state Constitution, expressly prohibiting such allocations in the future. However, that provision is not applicable to the allocations required by the previously enacted Assembly Bill 4X 26.

Section 9 of Proposition 22 states: "Section 16 of Article XVI of the Constitution *requires* that a specified portion of the taxes levied upon the taxable property in a redevelopment project each year be allocated to the redevelopment agency to repay indebtedness incurred for the purpose of eliminating blight within the redevelopment project area. Section 16 of Article XVI *prohibits* the Legislature from reallocating some or that entire specified portion of the taxes to the State, an agency of the State, or any other taxing jurisdiction, instead of to the redevelopment agency." (Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 22, § 9, p. 105, italics added.) Amicus curiae argues: "The adoption of Proposition 22 thus represents an express finding of the voters that takings such as those compelled by [Assembly Bill 4X 26] were always intended to be prohibited."

In *Matosantos*, the high court rejected this argument, explaining: "The assertion in Proposition 22, section 9 that the tax increment allocations to redevelopment agencies are constitutionally mandated, rather than constitutionally authorized and statutorily mandated, is a clear misstatement of the law as it stood prior to the passage of Proposition 22. Moreover, section 9 of Proposition 22 does not purport to amend article XVI, section 16 or to change existing law concerning the *source* of redevelopment agencies' entitlement, if any, to tax increment. Accordingly, we decline to treat its immaterial misstatement of law as a basis for silently amending the state Constitution." (*Matosantos, supra*, 53 Cal.4th at p. 259, fn. omitted.)[1]

The CRA Plaintiffs nevertheless contend obligations incurred by redevelopment agencies "that are not secured by a specific pledge of tax increment are

[1] Amicus curiae has requested that we consider several items of evidence regarding the impact of Assembly Bill 4X 26 on redevelopment agencies in the state. We decline the request. The indicated materials are not relevant to the issues determined in this matter. The Director has requested that we strike the amicus curiae brief in its entirety or at least those portions of the brief that rely on the foregoing evidence. We grant the Director's request only as to those portions of the amicus curiae brief that rely solely on the indicated evidence.

protected by constitutional designation of tax increment allocated to agencies as special funds." They argue: "Special fund rules govern agency tax increment funds. Agency indebtedness is secured by special funds created under [Article XVI, section 16] and [section] 33670. [Citation.] If special fund moneys are insufficient, creditors are not repaid. [Citations.] The reverse is also true. Money pledged to a special fund must be deposited in it and cannot be used for other purposes. [Citations.]" According to the CRA Plaintiffs, "[a]lthough many redevelopment special funds contain moneys not needed immediately to repay obligations, special fund moneys have always been protected as trust funds to pay existing obligations due in future years."

The CRA Plaintiffs cite as support *Marek v. Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070 [251 Cal.Rptr. 778, 761 P.2d 701] (*Marek*), where the high court indicated the term "indebtedness," as it relates to redevelopment agency obligations for purposes of allocating tax increment funds, should be interpreted broadly. (*Marek*, at pp. 1081–1086.) The court stated: "Article XVI, section 16, and section 33670, subdivision (b) dictate that tax increment revenues *'shall be allocated to* and when collected *shall be paid into a special fund of the redevelopment agency'* to pay its indebtedness. (Italics added.) The very notion of a 'special fund of the redevelopment agency' plainly implies that the agency itself will control the utilization of tax increment funds and militates against the notion of a process budgetarily controlled by county auditors. This reading of the 'special fund' language is virtually mandated by section 33603, the carry-over provision, which authorizes redevelopment agencies to 'invest any money held in reserves or sinking funds, or any money not required for immediate disbursement, in property or securities . . .' and section 33670 which mandates payment of tax increment revenues into the 'special fund' until the agency's 'loans, advances and indebtedness, if any, and interest thereon have been paid'. . . . Thus, the Auditor's notion that available tax increment funds not needed for expenditure in the upcoming fiscal year are to be distributed to other tax entities is wholly incorrect. It is clear the Legislature contemplated the 'special fund' would provide a reliable fund of money to be used to pay any and all obligations incurred by a redevelopment agency and that up to the amount of the agency's total indebtedness, tax increment revenues not expended currently would be accumulated for payment of such indebtedness when due." (*Marek*, at p. 1083, citation omitted.)

In *Matosantos*, the high court explained it did not decide in *Marek* that redevelopment agencies are constitutionally entitled to tax increment funds up to the amount of total indebtedness as a special fund. Rather, as explained above, article XVI, section 16, "authorizes the Legislature to statutorily grant redevelopment agencies rights to tax increment up to the amount of their total

indebtedness." (*Matosantos, supra*, 53 Cal.4th at pp. 258–259.) But, as the Legislature may extend that authorization, it may also limit or withdraw it altogether. (*Ibid.*)

■ We conclude article XVI, section 16, imposes no constitutional barrier to the Legislature reallocating tax increment funds from redevelopment agencies to other state purposes, just as the Supreme Court concluded in *Matosantos* that article XVI, section 16, imposes no barrier to the Legislature dissolving redevelopment agencies altogether.[2]

IV

*Proposition 1A*

■ As mentioned earlier, Proposition 1A prohibits the Legislature from enacting any law that modifies the manner of allocating property tax revenues so as to reduce the percentage of such taxes allocated among all of the local agencies in that county below what would have been allocated among those agencies for the fiscal year under the laws in effect before Proposition 1A was adopted. (Art. XIII, § 25.5, subd. (a)(1)(A).) However, Proposition 1A does not apply to redevelopment agencies. (*Matosantos, supra*, 53 Cal.4th at p. 249.)

Assembly Bill 4X 26 applies only to redevelopment agencies and directs them to transfer $2.05 billion to the SERAF's. It would appear, therefore, that Proposition 1A is not implicated. The CRA Plaintiffs argue Proposition 1A is in fact violated because the $2.05 billion transferred by redevelopment agencies will ultimately come out of the coffers of the local agencies that created them. They reason that tax increment funds are allocated to redevelopment agencies only to the extent necessary to pay redevelopment obligations. Once those obligations are satisfied, the tax increment funds are reallocated to the creating agency. Thus, if $2.05 billion is diverted from redevelopment agencies now, that money will have to be made up on the back end of the redevelopment process, thereby delaying the ultimate transfer of tax increment funds to the creating agency.

The County Plaintiffs similarly contend Assembly Bill 4X 26 violates Proposition 1A. They point out the legislation contains a provision, section

---

[2] The Director has requested that we take judicial notice of various reports from the State Controller and Legislative Analyst's offices relating to budgeting matter. The Director contends these materials are relevant to the issues raised in this dispute and are subject to judicial notice as official acts of executive departments. However, while the issuance of the reports may be official acts of the indicated departments subject to judicial notice, the contents of those reports are themselves hearsay. At any rate, our resolution of the issues raised in this matter does not require reference to the indicated materials. We therefore decline the Director's request.

33331.5, permitting the legislative body that created a redevelopment agency to extend the time limits for completion of redevelopment activities by one year upon payment of the SERAF obligation. The County Plaintiffs argue exercise of this option is a certainty and will result in an equivalent delay in the ultimate transfer of tax increment funds from the redevelopment agencies to the creating agencies, thus adversely impacting the creating agencies in violation of Proposition 1A.

The Director contends the foregoing issue has been resolved by the elimination of all redevelopment agencies pursuant to Assembly Bill 1X 26. According to the Director, the elimination of redevelopment agencies means there will be no one-year extension of redevelopment activities and, hence, no reduction in the flow of property tax revenue to the creating agencies. However, this argument ignores the one raised by the CRA Plaintiffs that every dollar taken from redevelopment agencies now will have to be made up by the creating agency at the back end. The obligations that might have been satisfied with the $2.05 billion do not just go away with the transfer of those funds to the SERAF's. They must be paid with other funds, which funds might otherwise have gone to the creating agency for other purposes.

Nevertheless, it is readily clear the CRA Plaintiffs' argument proves too much. They argue *any* transfer of funds from redevelopment agencies will inevitably come out of the coffers of the creating agencies. However, to accept this argument would mean that Proposition 1A, in effect, prohibits *all* transfers from redevelopment agencies. But this would be contrary to the voters' intent.

As explained in *Matosantos*, local government interests responded to raids on their funding "by qualifying for the ballot Proposition 65, a set of constitutional amendments to restrict such state actions in the future, but they subsequently agreed to support a compromise measure, Proposition 1A, instead. [Citations.] The voters approved Proposition 1A and rejected Proposition 65. Among its reforms, Proposition 1A prevented the state from statutorily reducing or altering the existing allocations of property tax among cities, counties, and special districts. [Citation.] Unlike Proposition 65, however, Proposition 1A did not extend its protections to redevelopment agencies. [Citations.]" (*Matosantos, supra*, 53 Cal.4th at p. 249.)

 In matters of statutory construction, the overriding concern is to determine the intent of the Legislature or the electorate in adopting the provision so that, if possible, such intent may be effectuated. (*Taxpayers to Limit Campaign Spending v. Fair Pol. Practices Com.* (1990) 51 Cal.3d 744, 764 [274 Cal.Rptr. 787, 799 P.2d 1220]; *Outfitter Properties, LLC v. Wildlife Conservation Bd.* (2012) 207 Cal.App.4th 237, 244 [143 Cal.Rptr.3d 312].)

For this court now to interpret Proposition 1A as prohibiting any change in funding for redevelopment agencies would clearly violate the intention of the voters in approving Proposition 1A while rejecting the alternate Proposition 65. We conclude Proposition 1A did not prohibit the transfer of tax increment funds from redevelopment agencies required by Assembly Bill 4X 26.

## V

### *Impairment of Contract*

 The CRA Plaintiffs contend Assembly Bill 4X 26 effects an unconstitutional impairment of contract and a taking of bondholders' contractual rights to tax increment funds. Both the state and federal Constitutions prohibit the enactment of any law that impairs contractual obligations. (U.S. Const., art. I, § 10, cl. 1; Cal. Const., art. I, § 9.) The CRA Plaintiffs identify a number of alleged contractual impairments, which we shall consider in turn.

First, the CRA Plaintiffs argue "[t]he Legislature's failure to increase the dollar limit on project tax increment debt (as in [Assem. Bill] 1389 . . .) impairs preexisting creditors' security." This is apparently a reference to section 33689, added by Assembly Bill 1389 (Stats. 2008, ch. 751, § 57), which provides that amounts paid by redevelopment agencies in the 2008–2009 fiscal year pursuant to Assembly Bill 1389 would not be counted as having been received by the agency for purposes of determining if the dollar limit of tax increment funds for the agency has been reached. However, the purpose of the dollar limit on tax increment debt was to set an upper threshold for when tax increment funding would no longer be allocated to the redevelopment agencies. Given that the redevelopment agencies no longer exist, so too do any dollar limits on their funding. And even if those dollar limits continued to apply to the successor agencies, the CRA Plaintiffs provide no basis for concluding those agencies would be impaired by Assembly Bill 4X 26 in their ability to meet contractual obligations. The CRA Plaintiffs' argument is thus premature. (See *San Miguel Consolidated Fire Protection Dist. v. Davis* (1994) 25 Cal.App.4th 134, 150–151 [30 Cal.Rptr.2d 343] [rejecting as premature a claim that a fire services contract " '*will be impaired*' " by a reduction in property taxes available to pay for the contract].)

The CRA Plaintiffs next argue the claims of existing redevelopment creditors have priority over obligations to fund SERAF's under Assembly Bill 4X 26. However, the fact existing creditors may have priority over other claims to tax increment funds does not establish that the rights of existing creditors are somehow impaired. Again, the argument of the CRA Plaintiffs is

premature. Assembly Bill 4X 26 provides that payments of obligations to redevelopment creditors *due in the current fiscal year* take priority over SERAF obligations. The CRA Plaintiffs point to nothing in this record to suggest current SERAF payments will impair payments to redevelopment creditors in future years.

The CRA Plaintiffs next point out that, as a result of Assembly Bill 4X 26, redevelopment bondholders have lost $2.05 billion in irrevocably pledged security. They argue the $2.05 billion lost through Assembly Bill 4X 26 cannot be recouped and will force agencies to borrow with no means of repayment. This claim likewise is premature. The CRA Plaintiffs provide no basis for assuming the loss of $2.05 billion in 2010 and 2011 will make it impossible for the successor agencies to meet redevelopment obligations. It is not enough simply that money has been taken away. That takeaway must cause an inability to otherwise meet obligations in order for there to be an impairment of contract.

The CRA Plaintiffs next take issue with the redefinition in Assembly Bill 4X 26 of "existing indebtedness" from the entire amount of indebtedness owed by the redevelopment agency to merely the amount due in the current fiscal year. They argue this change ignores the multiyear nature of such obligations. However, the CRA Plaintiffs fail to explain how this will result in an impairment of contractual obligations. On this record, there is no basis for concluding such change will prevent the successor agencies from ultimately paying all redevelopment obligations. Hence, this claim too is premature.

The CRA Plaintiffs next challenge the redefinition of "redevelopment" in Assembly Bill 4X 26 to include payments to schools and school districts in the redevelopment areas. They argue such payments violate redevelopment creditors' rights to those funds as provided in article XVI, section 16. According to the CRA Plaintiffs, "[t]he Legislature cannot adopt inconsistent definitions or alter definitions affecting past transactions." However, as explained earlier, article XVI, section 16, does not prohibit the use of tax increment funds for other than redevelopment purposes. Just as the Legislature is authorized, but not mandated, by article XVI, section 16 to allocate tax increment funds to redevelopment agencies, it can reallocate those funds elsewhere.

■ Finally, the CRA Plaintiffs argue section 33607.5, subdivision (f)(1)(B), is incorporated in all redevelopment bonds and contracts as a matter of law and provides that the payments made by redevelopment agencies under that section "are the exclusive payments that are required to be made by a redevelopment agency to affected taxing entities during the term of a redevelopment plan." (§ 33607.5, subd. (f)(1)(B).) However, as

previously explained, this statutory limitation can be superseded by a later-enacted provision, such as Assembly Bill 4X 26.

As support for their assertion that section 33607.5, subdivision (f)(1)(B), is incorporated in all redevelopment indebtedness as a matter of law, the CRA Plaintiffs cite *Sutter Basin Corp. v. Brown* (1953) 40 Cal.2d 235 [253 P.2d 649]. There, the state high court said the laws in existence at the time bonds are issued, "under the authority of which the bonds were issued, '. . . enter into and become a part of the contract to such extent that the obligation of the contract cannot thereafter be impaired or fulfillment of the bond obligation hampered or obstructed by a change in such laws.' " (*Sutter Basin*, at p. 241.) The CRA Plaintiffs also cite *May v. Board of Directors* (1949) 34 Cal.2d 125 [208 P.2d 661], where the court said: "The statute under which the bonds are issued is a part of the contract between the bondholders and the district and cannot be substantially impaired under the Constitution." (*May*, at p. 129.)

The short answer to the foregoing is that there is no showing in this matter that any change in the law brought about by Assembly Bill 4X 26 has or will substantially impair any contractual obligation that has been assumed by the successor agencies. As with their other claims, the CRA Plaintiffs' claim in this regard is premature.

The CRA Plaintiffs nevertheless cite as support for their impairment of contract claim the circumstances facing Union City RA, which purportedly anticipated tax increment funding for the 2009–2010 fiscal year of $18.6 million but faced existing debt obligations which would leave it with a surplus of only $2.6 million. However, Union City RA also faced a $7.7 million SERAF obligation under Assembly Bill 4X 26, thereby leaving it with insufficient funds to meet all current obligations. But, as previously explained, Assembly Bill 4X 26 provides that *current* fiscal year obligations of redevelopment agencies take precedence over the SERAF obligations. Thus, Union City RA is not required to default on such obligations in order to make SERAF payments.

Because we find no impairment of contract under the circumstances of this matter, we likewise dispose of the CRA Plaintiffs' takings claim, which relies on the same arguments. Furthermore, there has been no taking of any property of the redevelopment agencies, because they never had an irrevocable right to the tax increment funds required to be paid to the SERAF's.

VI

*Equal Protection*

The CRA Plaintiffs contend Assembly Bill 4X 26 violates equal protection principles by reallocating school funding in such a way as to benefit students

living or attending schools in redevelopment areas at the expense of all other students. Assembly Bill 4X 26 does this, they argue, by mandating that SERAF funds be spent in redevelopment areas, even though such expenditures might result in per-pupil expenditures in those areas far above such expenditures elsewhere.

The CRA Plaintiffs cite as illustrative Fountain Valley RA, which covers an area that is primarily industrial. According to the CRA Plaintiffs: "No public schools are in the Project. Using information from the 2000 Census and the District, the Agency estimated 56 K-12 students live within the project area. [Citation.] The Agency has assisted development of 15 housing units outside that area, excluding units occupied by seniors or others unlikely to generate students. The Agency estimated these units generate perhaps 8 public school students. [Citation.] Use of the Agency's 2009–2010 SERAF allocation to serve these 64 pupils as § 33690[, subdivision] (j) requires yields a per-pupil expenditure of $52,518. Average California per-pupil expenditures are $8,594."

The Director responds that the foregoing argument is based on a false assumption that SERAF money is allocated to individual students rather than to individual schools. According to the Director, school funding is a two-step process: "First, money is allocated to school districts. [Citation.] Then, the districts allocate funds to the schools. [Assembly Bill 4X 26] only provides guidance up to this point . . . ." The Director argues: "[O]nce SERAF money is given to a school, that school can use the funds in a way that benefits pupils living in redevelopment areas but that also benefits students who do not live in those areas. For example, if School X fixes its leaky roof with SERAF money, it keeps students A, B and C dry, all of whom live in the redevelopment area, but all students share in the benefits conferred by those improvements." The Director also argues it is hard to see how the disproportionate injection of $1.7 billion in fiscal year 2009–2010, which represents only 2.5 percent of total school funding, can cause an equal protection violation.

The trial court, for its part, agreed with the Director that Assembly Bill 4X 26 is intended to provide for funding of schools not individual students which, the court concluded, "avoids much of the disparities in per pupil funding resulting from" the CRA Plaintiffs' reading of the legislation. The court further concluded the legislation "must be read in the context of the highly complex and ongoing computations conducted pursuant to Education Code section 42238 et seq. to equalize funding and educational opportunities for students throughout California." According to the trial court: "This ongoing process can be expected to police and largely eliminate funding inequalities with respect to schools receiving SERAF funds."

■ We agree with the trial court. The constitutional guaranty of equal protection requires that those similarly situated with respect to the purpose of a particular law receive similar treatment under it. (*People v. Buffington* (1999) 74 Cal.App.4th 1149, 1155 [88 Cal.Rptr.2d 696].) Thus, "[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) If such unequal classification exists, the next step is to determine if the state can establish a sufficient justification for the differential treatment. (*Buffington*, at pp. 1155–1156.)

■ As the CRA Plaintiffs themselves acknowledge, there is no net increase in funding to school districts as a result of Assembly Bill 4X 26. Funding allocated to districts containing redevelopment areas will be offset by reductions in funding that would otherwise have been provided by the state. Under *Serrano I* and *Serrano II*, which eliminated local financing of education because of inherent funding disparities in violation of equal protection principles, the state is required to provide roughly equal educational opportunities to students throughout the state. We therefore presume efforts will be made by the state and local entities to maintain such rough equality. And while the CRA Plaintiffs point to an isolated case as demonstrating unequal classifications, such isolated case does not prove the rule. As a general matter, Assembly Bill 4X 26 does not create disparate classifications of students and therefore does not violate equal protection principles.

## VII

### *Proposition 98*

■ The CRA Plaintiffs contend Assembly Bill 4X 26 violates Proposition 98 which, as previously explained, requires minimum levels of funding for state schools. They argue: "SERAF funds cannot satisfy Proposition 98 because SERAF funds are severely limited in how and on whom they can be spent. [Citations.] SERAF is not available 'for the support of school districts' as Proposition 98 requires because SERAF is limited to 'pupils living in the redevelopment areas or in housing supported by the redevelopment agency funds.' " The CRA Plaintiffs assert such "[r]estricted-purpose" money cannot be counted toward the "general-purpose" money required by Proposition 98 for the support of schools.

The CRA Plaintiffs cite as support *Neecke v. City of Mill Valley* (1995) 39 Cal.App.4th 946 [46 Cal.Rptr.2d 266] (*Neecke*), where the Court of Appeal concluded an occupancy tax approved by a bare majority of the city electorate was not a *special tax* subject to a two-thirds majority vote

requirement. (*Neecke*, at pp. 950–951, 959.) The tax in question provided that the proceeds would be deposited in the city's general fund for expenditure on any and all city purposes. The court explained: "The essence of a special tax . . . is that its proceeds are earmarked or dedicated in some manner to a specific project or projects. . . . Such is not the case with funds placed in a city's general fund, which are available for use for any of the city's legitimate functions and are allocated during the general budgeting process in light of changing priorities and conditions." (*Id.* at p. 956.)

*Neecke* is of no assistance to the CRA Plaintiffs. It provides no guidance as to whether funds allocated to school districts by virtue of Assembly Bill 4X 26 may be counted toward the state's Proposition 98 obligations. The CRA Plaintiffs themselves acknowledge Assembly Bill 4X 26 effects no net increase or decrease in overall school funding. At most, it results in a reallocation of funding among the various schools in the state. However, it contains no restriction on how such funds may be spent. But even if it did, the CRA Plaintiffs provide no basis for concluding such restricted funds cannot be counted toward the state's Proposition 98 obligations. Their Proposition 98 claim is therefore a nonstarter.

## VIII

### Proposition 13

The County Plaintiffs contend Assembly Bill 4X 26 violates Proposition 13 by taking money from local redevelopment agencies and reallocating it to the state for use in satisfying state obligations. Proposition 13 added article XIII A to the state Constitution. Section 1, subdivision (a) article XIII A reads: "The maximum amount of any ad valorem tax on real property shall not exceed one percent (1%) of the full cash value of such property. The one percent (1%) tax to [*sic*] be collected by the counties and apportioned according to law to the districts within the counties."

It is undisputed the foregoing provision expressly authorizes the Legislature to apportion property tax revenue among the various local governmental entities. (See *San Miguel Consolidated Fire Protection Dist. v. Davis, supra,* 25 Cal.App.4th at p. 148.) However, the County Plaintiffs contend Assembly Bill 4X 26 goes further and permits the Legislature to apportion property tax revenue to itself to pay state expenses. It does this, they argue, by the following scheme of laundering the funds through local school districts. First, the funds are deposited in SERAF's. The SERAF funds are then allocated to school districts serving redevelopment areas. For every

dollar allocated to those school districts, a dollar is taken from the school district and deposited in the county SRAF. Those SRAF funds are then transferred into the county office of education from which they are transferred to the state as reimbursement for state-funded local services. In effect, the tax increment funds are taken from local redevelopment agencies and used instead to pay for other local services.

 Unlike the County Plaintiffs, we do not see the foregoing scheme as taking funds from the redevelopment agencies and giving them to the state. Section 33690, subdivision (k)(1), requires that the amount of property tax allocated to a school district be reduced by the amount of SERAF funds received by that district. The funds so saved must be deposited in the county SRAF established pursuant to Revenue and Taxation Code section 100.06. (§ 33690, subd. (k)(1).) Revenue and Taxation Code section 100.06, subdivision (c)(1) provides: "Except for those moneys subject to paragraph (3) [money deemed unnecessary to fund local services], the moneys in the [SRAF] shall be transferred by the county office of education to the Controller, in amounts and for those purposes as directed by the Director of Finance, exclusively to reimburse the state for the costs of providing health care, trial court, correctional, or other state-funded services and costs, until those moneys are exhausted. Moneys in a[n] [SRAF] shall be transferred to reimburse only those costs incurred, and the costs of services provided, in the county in which those moneys are collected."

 Under the foregoing scheme, funds taken from the redevelopment agencies pursuant to Assembly Bill 4X 26 are ultimately given to the state as reimbursement for expenditures by the state for local services. In effect, the funds are taken from one local agency and given to another. As we see it, this is consistent with Proposition 13, which authorizes the state to allocate the 1 percent property tax among the various local districts. We are aware of no limitation on such allocation for local expenses that might otherwise be required to be funded by the state. The local entities retain control over budgetary decisions, programs and service priorities (see *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 226 [149 Cal.Rptr. 239, 583 P.2d 1281]), with the state merely being reimbursed for expenses it must incur for those locally determined expenditures.

IX

*Gift of Public Funds*

The CRA Plaintiffs contend Assembly Bill 4X 26 amounts to a gift of public funds in violation of article XVI, section 6. That constitutional

provision bars the Legislature from, among other things, "mak[ing] any gift or authoriz[ing] the making of any gift, of any public money or thing of value to any individual, municipal or other corporation whatever." (Art. XVI, § 6.) Citing *Golden Gate Bridge and Highway Dist. v. Luehring* (1970) 4 Cal.App.3d 204 [84 Cal.Rptr. 291] (*Golden Gate Bridge*), the CRA Plaintiffs argue article XVI, section 6 prohibits taking funds from one governmental entity to benefit another unless the funds are used to further the public purpose of the transferring entity. They further argue funds raised for a limited purpose, such as redevelopment, may not be diverted to an extraneous purpose.

*Golden Gate Bridge* is inapposite. That case involved an attempt by a bridge district to transfer excess funds collected from tolls to various counties for general use therein. Such transfer would have taken funds collected from one class of users, bridge patrons, and delivered them to another class, county taxpayers, for a purpose unrelated to the limited special purpose of the bridge district.

The present matter is more akin to *White v. State of California* (2001) 88 Cal.App.4th 298 [105 Cal.Rptr.2d 714] (*White*), where the Legislature passed four bills that allocated certain property and sales taxes, previously allocated to various Orange County agencies, to the county's general fund in order to assist the county in emerging from bankruptcy. (*White*, at p. 301.) The Court of Appeal found no violation of article XVI, section 6. Distinguishing *Golden Gate Bridge*, the court explained the bills "do not involve transfers of funds from one agency to the other, but instead concern the Legislature's reallocation of funds from Orange County local agencies to the county's general fund." (88 Cal.App.4th at p. 312.) According to the court, "[a]rticle XVI, section 6 is not triggered merely because the Legislature has allocated less property tax dollars to certain local agencies and instead determined that such funds should be allocated to the general fund to be used for a public purpose." (*Ibid.*) The court further indicated the same group of individuals that paid the taxes, county property and sales taxpayers, will benefit from the transfer. (*Ibid.*) Finally, the court indicated the funds in question had not been specially raised for the purposes of the transferring agencies, as in *Golden Gate Bridge*, but were levied as general property and sales taxes and thereafter allocated to the agencies. (*Id.* at p. 313.)

In the present matter, the funds in question were not raised by the redevelopment agencies for a specific purpose. They came from general property taxes that were allocated to the agencies. This is not a transfer of

funds from the redevelopment agencies to other local agencies, as in *Golden Gate Bridge*, but a reallocation of funds by the Legislature from one public purpose to another. And the same general group of individuals that contributed the funds, county property taxpayers, will benefit from the use of those funds elsewhere. Under these circumstances, there has been no gift of public funds within the meaning of article XVI, section 6.

## X

### *Home Rule*

 At oral argument, the CRA Plaintiffs asserted Assembly Bill 4X 26 violates California's home rule doctrine by reallocating to other uses funds that had previously been allocated to redevelopment agencies. However, this argument was not raised in the CRA Plaintiffs' briefs on appeal. "It is a clearly understood principle of appellate review, so well established as to need no citation to authority, that contentions raised for the first time at oral argument are disfavored and may be rejected solely on the ground of their untimeliness." (*People v. Harris* (1992) 10 Cal.App.4th 672, 686 [12 Cal.Rptr.2d 758].)

The CRA Plaintiffs assert the issue was raised in their reply brief. However, points first raised in a reply brief will not be considered unless good cause is shown for failure to present them earlier. (*Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788].) The CRA Plaintiffs provide no good cause for failing to raise their home rule argument sooner.

Furthermore, we disagree the point was raised in the CRA Plaintiffs' reply brief. The argument to which the CRA Plaintiffs refer dealt with article XVI, section 16 of the state Constitution, not article XI, the home rule provision. The CRA Plaintiffs argued article XVI, section 16 authorized the Legislature to enact the CRL notwithstanding the home rule rights of charter cities. The CRA Plaintiffs further argued that, once the Legislature so acted, it could not repeal or modify the financing scheme established by the CRL. According to the CRA Plaintiffs, article XVI, section 16 mandates that, once redevelopment is financed by tax increment funds, those funds must be spent on redevelopment. We rejected this argument earlier in this opinion.

Because the CRA Plaintiffs first raised their home rule issue at oral argument, thus giving the Director no opportunity to prepare a response, we decline to consider it on appeal.

DISPOSITION

The judgments in *CRA v. Matosantos II* and *County v. Matosantos* are affirmed. The order awarding attorney fees in *CRA v. Matosantos I* is reversed. The defendants in all three cases are entitled to their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Blease, Acting P. J., and Mauro, J., concurred.

The petition of appellant County of Los Angeles for review by the Supreme Court was denied May 1, 2013, S209079.